GEORGIA M. PESTANA
Acting Corporation Counsel of the City of New York
Attorney for the City of New York and
New York City Department of Citywide Administrative Services
100 Church Street
New York, New York 10007
(212) 356-2113
Zachary B. Kass
zkass@law.nyc.gov
Samantha Chu
sachu@law.nyc.gov

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

EAST BROADWAY MALL,

                      Debtor.

Chapter 11
Case No: 19-12280-scc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CITY OF NEW YORK'S OBJECTION TO DEBTOR'S MOTION FOR
ORDER PURSUANT TO 11 U.S.C. §§ 365(d)(4) EXTENDING TIME TO
ASSUME OR REJECT UNEXPIRED LEASE OF NON-RESIDENTIAL
REAL PROPERTY**

        The City of New York and its agency, the New York City Department of Citywide Administrative Services (collectively, the "**City**"), by its counsel, GEORGIA M. PESTANA, Acting Corporation Counsel of the City of New York, hereby files this objection (the "**Objection**") to the motion (the "**Motion**") made by East Broadway Mall, the debtor and debtor-in-possession in this case ("**EBM**" or the "**Debtor**") for an order pursuant to 11 U.S.C. § 365(d)(4) extending its time to assume or reject a lease of non-residential real property between the Debtor and the City (as more fully described below) for ninety days beyond the date that is 120 days after the date of the filing of the Chapter 11 petition. In support of its Objection the City respectfully represents:

1

## BACKGROUND

1. A summary of the relevant facts is set forth below, to provide a context for the arguments to follow.

2. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 12, 2019 (the "**Petition Date**"). The Debtor has continued as debtor-in-possession. No creditor's committee or trustee has been appointed.

3. Following the Petition Date, the Debtor filed an application to employ The Cary Group to provide government relations advice and legal assistance and lobbying services. By order dated September 26, 2019, the Court authorized the retention of the Cary Group.

4. On October 16, 2019, the Debtor filed the Motion, seeking to extend its time to assume or reject the lease with the City for an additional ninety days.

5. Since the Petition Date, the Debtor has continued to use and occupy the real property subject to the lease with the City and to operate its business thereon. However, since the Petition Date, the Debtor has paid not one cent to the City for its continued occupancy of the property, in blatant disregard of its obligations under the lease and the Bankruptcy Code. Indeed, at the time of the Chapter 11 filing, the Debtor had paid not one cent to the City for occupancy of the property since September 26, 2018, in further blatant disregard of its obligations under the lease and under a pending State Court *Yellowstone* Order (as discussed more fully below).

**The Lease Provisions**

6. Prior to the Petition Date, by lease dated as of March 1, 1985 (the "**1985 Lease**"), the City, through the New York City Department of General Services, now consolidated as part of the Department of Citywide Administrative Services ("**DCAS**") as Landlord and Debtor as Tenant entered into a 50-year lease for use of land beneath the Manhattan Bridge, originally designated as

2

59-77 Division Street, Manhattan, later re-designated as 88 East Broadway, and thereafter developed by Debtor, pursuant to the terms of the Lease (the "**Premises**"). The Premises is delineated on the Tax Map of the City of New York, County of New York, as Block 282, Lot 44.

7. The 1985 Lease was subsequently amended in November 1995 by First Amendment to Lease ("**First Lease Amendment**") in connection with the settlement of a non-payment proceeding brought against Debtor in July 1994. A copy of the First Lease Amendment is annexed hereto as Exhibit B. The 1985 Lease and the First Lease Amendment are referred to together herein, as the "**Lease**", and copies of both documents are attached hereto collectively as Exhibit "A".

**Lease Provisions Regarding Payment of Base Rent,
Percentage Rent, PILOT, Late Charges, and Water Charges**

8. Pursuant to Articles 3, 4, 5, 9, and 12 of the Lease, Debtor is required to pay Base Rent [Article 3], Percentage Rent [Article 4], PILOT [Article 5], applicable Late Charges [Article 9] and Water Charges [Article 12] to the City.

9. **Base Rent**: Article 3 of the Lease requires Debtor to pay monthly Base Rent to the City in the amount of $62,208.00,[1] on the first day of each month. *See* Exhibit A, 1985 Lease, Article 3.[2]

10. **Percentage Rent**: Article 4(1) of the Lease requires Debtor to make Percentage Rent payments to the City for each fiscal year commencing with the third Lease year.[3] Article 4(1)(b)

---

[1] Base Rent amount applicable to the period beginning October 1, 2015.

[2] Article 3, entitled Base Rent, prohibits Debtor from setting off or deducting any monies from the Base Rent due. It provides, in pertinent part:
> Tenant shall pay rent in equal monthly installments in advance on the Lease Term Commencement Date and on the first day of each month during the Lease Term at the Office of the Landlord or such other place as the Landlord may designate <u>without any set off and deductions whatsoever</u>…Debtor

Exhibit A, 1985 Lease, Article 3, p. 3. Emphasis added.

3

permits Debtor to deduct certain common area maintenance charges from Gross Operating Revenue and Article 4(5) permits Debtor to deduct certain PILOT payments from Gross Operating Revenue, when calculating Percentage Rent due to the City for a particular fiscal year. Article 4 of the First Lease Amendment, also requires Debtor to submit Certified Financial Statements for each fiscal year[4] to the City, to enable the City to determine the Percentage Rent due.

11. **PILOT**: Pursuant to Article 5 of the Lease and the Board of Estimate Resolution, Debtor is required to pay PILOT to the City, calculated as follows: 100% of the current assessed value of the demised land as determined by the New York City Department of Finance ("Finance"), plus 100% of the current assessed value of the improvements thereon, multiplied by the prevailing real property tax rate. Pursuant to Article 4(4) of the Lease, the PILOT is deemed to be "additional rent" or "rent" for all purposes, including the default provision contained in Article 19 of the Lease. *See* Exhibit A, 1985 Lease, Article 5.

12. Lease Article 5 requires Debtor to timely pay PILOT (as well as Base Rent), without "abatement, deduction or set-off."[5]

---

[3] Percentage Rent is to be paid to the City in an annual sum equal to the following percentage of the Gross Operating Revenue: 0% of the first $500,000.00 of Gross Operating Revenue; 3% of the next $500,000.00 of Gross Operating Revenue; 6% of the next $500,000.00 of Gross Operating Revenue; and 9% of any additional Gross Operating Revenue.

[4] Debtor's fiscal year runs from September 1st through August 31st of a given year.

[5] Article 5 of the Lease provides, in pertinent part that
    The Base Rent and the Additional Rent shall be paid to the Landlord at the address of the Landlord set forth above, or at such other address as the Landlord shall designate to the Tenant in writing, in lawful money of the United States, without notice or demand and without abatement, deduction or set-off of any amount or for any reason whatsoever.
Exhibit A, hereto, 1985 Lease, Article 5, pp. 9-10. Emphasis added.

13. **Water Charges**: Pursuant to Article 12 of the Lease, Debtor is required to timely pay the charges for all utilities and services consumed at or with respect to the Premises, including, without limitation, Water Charges. Exhibit A, 1985 Lease, Article 12.

14. **Late Charges**: Lease Article 9 authorizes the assessment of late charges in the amount of 1.5% per month ("Late Charges") for payments that are not made in a timely manner. Exhibit A, 1985 Lease, Art. 9, Late Charges.

**The Notice to Cure**

15. On April 9, 2018, the City personally served Debtor with a notice to cure dated April 2, 2018 ("**Notice to Cure**"), which notified Debtor of its default of its Lease obligations to pay: Base Rent, PILOT, and Water Charges, and provided Debtor with a ten-day period in which to cure its defaults. A copy of the Notice to Cure is attached hereto as Exhibit "B".

16. As set forth in the Notice to Cure, Debtor then owed the City a total of Six Million, Three Hundred Seventy-Five Thousand, Eight Hundred and Sixty One Dollars and Fifty Four cents ($6,375,861.54), calculated as follows: Base Rent arrears of $404,352.00, PILOT arrears of $3,649,680.00, Water Charge arrears of $603,821.00;[6] and Late Charges of $1,715,007.00. See Exhibit B, hereto, Notice to Cure; and Exhibit A, hereto, the 1985 Lease, Art. 9, Late Charges. Debtor also owes Percentage Rent arrears of at minimum of $9,956.00 per year for years 2015, 2016, 2017, 2018 ($39,824.00). This figure is a minimum approximation as the figure is from the

---

[6] With respect to the Water Charge arrears, on May 31, 2018, Plaintiff entered into a payout agreement with the New York City Department of Environmental Protection ("DEP") to pay in installments, its then outstanding Water Charge arrears of $629,477.88 (for the period of March 10, 2009 through May 16, 2018) ("DEP Payout Agreement") along with assessed interest (totaling $190,471.02 at the time the agreement was entered into). Pursuant to the DEP Payout Agreement, Debtor is required to make 120 consecutive monthly installment payments of $5,245.65 toward its then outstanding Water Charges of $629,477.99, as well as the interest payments due, beginning July 10, 2018. The DEP Payout Agreement also requires Debtor to pay its newly accruing Water Charges. The DEP Payout Agreement provided that the monthly installment payment of $5,245.65, and the interest due would be consolidated in each monthly current Water Charge bill.

5

sole year Debtor made a Percentage Rent payment to the City in 2014. As the Percentage Rent calculation is based off of the Debtor's Certified Financial Statement Gross Operating Revenue Figures, none of which have been provided to the City as ordered by the *Yellowstone* injunction.

**Debtor Commences Action and**
**Moves for a *Yellowstone* Injunction**

17. On May 10, 2018, in response to the Notice to Cure, the Debtor, as Plaintiff, e-filed a motion in in the Supreme Court of the State of New York, County of New York (the "**State Court**"), Index No. 154341/2018, for a *Yellowstone* injunction, seeking to toll the 10-day cure period set forth in the Notice to Cure. The Debtor thereafter filed additional pleadings, including an Amended Complaint[7], and the City filed pleadings in opposition, including an answer and counter-claims.[8]

18. During oral argument on the motion for *Yellowstone* relief, Debtor made clear that the amount of Base Rent and Water Charges were undisputed, and that Debtor was only disputing the City's calculation of PILOT and Percentage Rent.

---

[7] Through its Amended Complaint, Debtor asserted two causes of action. Its First Cause of Action erroneously alleges that the City misinterpreted the Lease provisions relating to the deduction of PILOT payments from Gross Operating Revenue when calculating the Percentage Rent owed to the City, pursuant to Article 4(1) of the Lease. The Second Cause of Action erroneously alleges that the City misinterpreted the Lease because Lease Article 5(c) does not accurately reflect the PILOT calculation formula set forth in the Board of Estimate Resolution, dated May 24, 1984, for the period of Lease year eight through the Lease expiration date (October 1, 1993 through September 30, 2035).

[8] The City's First Counterclaim seeks a declaration that i) to the extent Plaintiff seeks to deduct PILOT payments from Gross Operating Revenue for the purpose of determining the Percentage Rent due to the City, PILOT payments can only be deducted from Gross Operating Revenue pursuant to Article 4(5) of the Lease, the PILOT Deduction Provision; and ii) the PILOT formula for Lease years eight through the Lease expiration date is correct and consistent with the formula set forth in the BOE Resolution. The Second Counterclaim seeks an order requiring Plaintiff to submit its Certified Financial Statements required by Article 4 of the Lease (Exhibit B, hereto, First Lease Amendment, Article 4) for fiscal years 2015 forward. The Third Counterclaim seeks an Order and Judgment granting damages to the City for outstanding Base Rent, PILOT and Late Charges. Its Fourth Counterclaim seeks a judgment declaring that i) Plaintiff has breached the Lease; ii) the City had the right to serve Plaintiff with the 2018 Notice to Cure; and iii) the City may terminate the Lease.

6

**The Debtor's Partial Payment**

19. The motion was marked fully submitted on September 26, 2018. In State Court that day, Debtor made a payment of $500,000.00 toward its then outstanding Base Rent of $575,784.52[9], leaving a Base Rent balance of $75,784.52, exclusive of Late Charges. Because Debtor did not dispute the amount of Base Rent and Water Charges due to the City, it was expected that Debtor would continue to make those payments while the motion was *sub-judice* at the State Court. The Debtor, however, failed to make such payments.

**The State Court's *Yellowstone* Decision and Order and the Debtor's Failures to Comply**

20. By Decision and Order dated January 28, 2019, the State Court granted Debtor's motion for a *Yellowstone* injunction, but conditioned the continuation of the injunction on Debtor's timely payment to the City of Base Rent, PILOT, and Water Charges pursuant to the DEP Payout Agreement[10] (the "**State Court *Yellowstone* Order**"), a copy of which is annexed hereto as Exhibit "C."

21. The State Court also found that the formulas the City applied to the calculation of PILOT and Percentage Rent due were correct, pursuant to the terms of the Lease. The State Court, however, specifically stated that the award was "*pendente lite*, and non-final." *Id*.

22. The State Court then set a conference date of February 27, 2019 to discuss the Certified Financial Statements, which Debtor was required to submit to the City pursuant to Article 4 of the Lease, to enable the City to determine the amount of Percentage Rent owed, which

---

[9] Which payment, upon information and belief, was from an unrelated company managed by the Principal Grace Chan or her family.

[10] Presumably, the Court did not direct Debtor to make its Percentage Rent payments going forward, because the amount due cannot be calculated as Debtor failed to submit its Certified Financial Records for fiscal years 2015 forward.

7

Debtor failed to submit to the City for fiscal years 2015 forward. By Order dated February 27, 2019, the Court required Debtor to produce its Certified Financial Statements for fiscal years 2015-2018, within 60 days (i.e., by April 28, 2019). A copy of the order is attached hereto as Exhibit "D."

23. Not surprisingly, as of the close of business on Monday, April 29, 2019, Debtor had failed to produce the required Certified Financial Statements, in defiance of the State Court's February 28th Order.[11] Furthermore, as of that date, the Debtor had not made any further payment of Base Rent, PILOT, or Percentage Rent payments as required by the State Court *Yellowstone* Order. All this was further proof of Debtor's unwillingness to comply with the State Court's orders or the terms of the Lease.

24. Further proceedings in the State Court followed, and it appeared likely that the State Court would dissolve the *Yellowstone* injunction because of the Debtor's failure to make any payments or produce any financial records in compliance with the State Court's orders. On the eve of a pending hearing in the State Court, rather than comply with the State Court's orders, the Debtor chose to go forum shopping, and filed its Chapter 11 Petition.

**The Debtor's Arrearages As of the Petition Date**

25. As noted above, the Debtor filed its Chapter 11 petition on July 12, 2019. As of the Petition Date, the City's current calculations, based on its books and records, show that the Debtor owed a total of at least $8,853,236.69 to the City under the Lease, consisting of Base Rent: $697,864.52; PILOT: $4,777,057.97; Water Charges: in an amount to be determined. In addition, the Debtor owes an amount of Percentage Rent which cannot be presently determined because of

---

[11] We note that Certified Financial Statements are not the only financial documents that the Debtor is deficient in generating. Upon information and belief, the Debtor has never filed City tax returns other than for 2007 and 2014; the Debtor has not remedied this deficiency since it filed for Chapter 11 relief.

8

Debtor's failure to provide State Court ordered Certified Financial Statements and required Gross Operating Revenue figures.

26. In addition, since the Petition Date, the City's current calculations, based on its books and records, show that the Debtor has failed to pay a total of at least $442,145.80 to the City under the Lease consisting of Base Rent: $186,624.00; PILOT: $240,383.43; Water Charges: in an amount to be determined; and Percentage Rent in an unknown amount.

## DISCUSSION

### No Cause Exists to Justify Extending Debtor's Time to Assume or Reject the Lease

27. Pursuant to Section 365(d)(2) of the Bankruptcy Code, 11 U.S.C. § 365(d)(2), ordinarily a trustee or debtor-in-possession has until plan confirmation to decide whether to assume or reject an executory contract or unexpired lease. However, the breathing space afforded to the debtor for the assumption or rejection of executory contracts is not without limits. Under Section 365(d)(2), any party to an executory contract or unexpired lease may request that the court fix a time within which the debtor must assume or reject such contract or lease. Moreover, as discussed more fully below, with respect to unexpired leases of non-residential real property, the time window is expressly limited by the provisions of Section 365(d)(4).

**The Section 362(d)(2) Factors**

28. The cases considering Section 362(d)(2) generally hold that the trustee or debtor should be afforded a reasonable time to make the assumption or rejection decision. What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the

9

circumstances of each case. *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982); *accord, In re Hawker Beechcraft, Inc.,* 483 B.R. 424, 428-429 (Bankr. S.D.N.Y. 2012); *In re Adelphia Communs. Corp..*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

29. Courts have articulated various tests or guidelines that should inform the decision whether to enlarge or reduce a debtor's time to assume or reject an executory contract. In *In re Adelphia Commc'ns*, Bankruptcy Judge Gerber of this district synthesized these decisions and developed a twelve factor test that included the following elements:

1. the nature of the interests at stake;

2. the balance of the hurt to the litigants;

3. the good to be achieved;

4. the safeguards afforded to the litigants;

5. whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;

6. the debtor's failure or ability to satisfy post-petition obligations;

7. the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;

8. the importance of the contract to the debtor's business and reorganization;

9. whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;

10. whether there is a need for judicial determination as to whether an executory contract exists;

11. whether exclusivity has been terminated; and

12. above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

*In re Adelphia Commc'ns*, 291 B.R. at 293 (quotations marks and citations omitted); *accord, In re Hawker Beechcraft, Inc.,* 483 B.R. 424, 428-429 (Bankr. S.D.N.Y. 2012); *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006). These factors are not exhaustive, and depending on the circumstances, there may be other factors that a bankruptcy court should consider. *See South Street Seaport Limited Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 761 (2d Cir. 1996). The burden rests with the movant to demonstrate cause. *Hawker Beechcraft, Inc.,* 483 B.R. at 429; *Dana Corp.*, 350 B.R. at 147.

**The Limitations Under Section 365(d)(4)**

30. As noted above, the Debtor's time for assuming the Lease is also subject to Section 365(d)(4), which expressly creates a limited window of time in which a nonresidential lease may be assumed or rejected, and provides:

> (A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of --
>   (i) the date that is 120 days after the date of the order for relief; or
>   (ii) the date of the entry of an order confirming a plan.
> (B)   (i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

(ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

31.     The text of section 365(d)(4), therefore, limits extensions once the initial 120-day period expires. Section 365(d)(4)(B)(i) permits the bankruptcy court, upon motion, to grant a 90-day extension "for cause." After that initial extension of time, any further extension may be granted "only upon prior written consent of the lessor in each instance." 11 U.S.C. § 365(d)(4)(B)(ii). See e.g., *Condal Distribs., Inc. v 2300 Xtra Wholesalers, Inc (In re 2300 Xtra Wholesalers, Inc.)*, 445 B.R. 113, 121-122 (S.D.N.Y. 2011).

32.     In the Motion, the Debtor asserts that its initial deadline for assumption or rejection should be considered to be November 11, 2019 (the "**November 11 Deadline**"). Motion, ¶17. The Debtor requests that the deadline be extended for ninety days, that is, through February 9, 2020 (the "**February 9 Extension Date**"). Motion, ¶14.

33.     The Debtor concedes that the extension may only be granted for "cause." Motion, ¶15. The City submits that the Debtor has not, and cannot, demonstrate appropriate "cause" for such an extension. Accordingly, the City respectfully requests that this Court determine that the Lease should be deemed rejected as of the November 11 Deadline, and direct that the Debtor immediately surrender the real property thereupon. As set forth below, the subtenants and their interests in the Premises will be protected.

**The Relevant Factors Favor Denying An Extension of the Time to Assume or Reject**

34.     The Debtor's Motion highlights several factors which it argues support its position. In fact, however, each of those factors undercuts its position.  The first factor discussed is

"whether the debtor was paying for the use of the property." Motion, ¶16. The unvarnished fact is that the Debtor had been in Chapter 11 for ninety six days when it filed the Motion, and had not paid one cent to the City under the Lease or otherwise, for the use of the property. The Debtor's assertion that it deposited an amount to cover the base rent in its DIP operating account to cover August, September and October, and will "release" it to the City if and when it gets a cash collateral order, Motion, ¶20, hardly amounts to timely payment for the use of the property.

35. At the time that the Debtor filed the Motion, it also filed a proposed stipulated Cash Collateral order, under which it would make monthly payments to the City solely in the amount of the Base Rent. After discussions with the City, the Debtor and the Bank proposed a modified budget, under which the Debtor would pay to the City the monthly Base Rent, plus $7,500.00 toward the PILOT obligation, (which the City asserts is far less than if paid in full), and $5,475.00 toward water and sewer charges. The City asserts that any such cash collateral order should provide that the City's rights under the Lease and the Bankruptcy Code are not waived or otherwise affected by the order, and are expressly preserved (including, without limitation, the right to object to the Debtor's request for an extension, and to press the arguments set forth in this Objection.)

36. Accordingly, contrary to the Debtor's assertions in the Motion, the City asserts that the Debtor's proposed payment of these base rent and partial PILOT amounts, does not comply with Section 365(d)(3), which requires that that the Debtor shall timely perform all the obligations of the debtor under the Lease arising from and after the Petition Date. The Debtor may not unilaterally decide to pay less than the full rental amount; it must pay the full contract rate. See, e.g., *In re Stone Barn Manhattan LLC*, 398 B.R. 359, 362 (Bankr. S.D.N.Y. 2008):

In effect, § 365(d)(3) required timely payment of rent, and it eliminated the discretion that courts had previously exercised to establish a market rent for use and occupancy, fixing the amount payable for use and occupancy at the rate provided in the lease. *In re Ames Dep't Store, Inc.*, 306 B.R. 43, 68 (Bankr. S.D.N.Y. 2004). As this Court has observed, many courts "have found § 503(b)(1) to be superseded by § 365(d)(3); to hold otherwise would flout the intent of Congress in that the landlord would still be forced to provide current services while awaiting an evidentiary hearing to determine the actual amount the debtor owed it." *In re P.J. Clarke's Restaurant Corp.*, 265 B.R. 392, 397 (Bankr. S.D.N.Y. 2001), quoting *In re Wingspread Corp.*, 116 B.R. 915, 926 (Bankr. S.D.N.Y. 1990). (Emphasis supplied).

37. We note that, although Section 365(d)(3) permits the Debtor to request the Court to extend for cause the time to perform obligations arising during the first sixty days of the case, the Debtor here chose not to seek such relief from the Court. Instead, it blithely and unilaterally disregarded its obligations under the Lease and under the Bankruptcy Code.[12] The Debtor's assertion that it proposes to "continue" to perform only its "undisputed" obligations under the Lease, Motion, ¶21, is disingenuous at best. Accordingly, this factor strongly undercuts the Debtor's position.

38. The Debtor's second argument is that the City will not be damaged beyond the compensation available under the Bankruptcy Code. This is erroneous. Of course, as noted above, the City has a right to timely payment of the full contractual post-petition rent under Section 363(d)(3). That right is an interest in property that is entitled to adequate protection. See, e.g., *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001). In this case, the Debtor is neither timely performing its obligations nor providing adequate protection. Moreover, even if the City's rights were to be analyzed as a mere administrative expense, the City would not

---

[12] Notably, apparently the only post-petition payment that the Debtor regularly has been making is roughly $50,000.00 a month to Bank of Hope on account of the Leasehold Mortgage presumably because the principal of the Debtor has given the Bank a personal guarantee. Accordingly, to date, the Debtor has used the property, without paying any rent, to generate funds to pay the Bank four monthly payments of $50,000 (a total of $200,000) for the indirect benefit of its principal.

14

recover the compensation to which it is entitled. The Debtor has admitted that it "cannot afford to pay" the full amounts called for under the Lease; further, it does not propose to do so, even on an interim basis. Motion, ¶10. Apparently, every day that passes makes the Debtor more administratively insolvent. Thus, even as an administrative expense, the Debtor cannot show that the City will recover the compensation that it is due under the Bankruptcy Code – certainly not for any extension period that the Court might grant under the Motion.

39. The Debtor's third argument is that the Lease is the primary asset of the Debtor. Motion, ¶23. While this is undoubtedly true, it does not really help the Debtor. Because the Debtor cannot survive without the Lease, it is clear that Debtor will try to assume it. Thus, one of the primary grounds for granting an extension of the time to assume or reject – that the debtor needs additional time to make up its mind -- is not relevant here. The Debtor's assertion that it has a prospective new tenant that will add substantially to its income stream, Motion, ¶¶22-23, is not entitled to much credence. The Debtor has not made a motion for authority to enter into a new lease, nor has it shown any evidence that such a transaction is imminent. Moreover, this assertion appears inconsistent with the Debtor's prior assertion that it is not able to attract new tenants, or retain old ones, as long as the current PILOT requirement in the Lease remains in place. See, Motion, ¶¶11-12.

40. The Debtor's fourth argument is that the Debtor's retained consultants should be given time to negotiate a settlement. Motion, ¶24. However, the City notes that it has been litigating and negotiating with the Debtor for many years. Even assuming the good will and competence of the Debtor's new counsel and its new advisors, the City is not aware of any new facts – or even new proposals -- that would help reestablish the confidence in the Debtor that

15

would be needed to make any such negotiation meaningful. To date, the City has not been made aware of any communication with the Debtor's retained lobbyist, the Carey Group, nor any efforts thereof to discuss the Debtor's Lease with the City nor any business reports which demonstrate its financial liquidity or willingness and ability to cure its owed arrears to the City. The $10,000.00 per month expended on such cost seems to be a frivolous opportunity for Debtor to spend money it should be paying the City or setting aside for payment of its arrears.

41. In addition, other factors weigh against granting an extension. For example, the Debtor implies that the balance of hurt to the litigants and the good to be accomplished both favor its position, because if it loses the Lease, the property will go dark, the subtenants will be dispossessed, and the community will be benighted. None of this is true, however. First, in the event that the Debtor surrenders the property to the City, the City will immediately take steps to find an appropriate property manager who will protect the property and the subtenants. The City believes that such new management would be of substantial benefit to the community and the subtenants, given the Debtor's long record of defaults and mismanagement. Second, Article 25(5) of the Lease protects the rights of the subtenants because it provides that "all of the Subtenants shall attorn to Landlord and Landlord shall accept attornment by a Subtenant. . . ." Further, the Debtor's attempt to position itself as the champion of the subtenants' interests rings particularly hollow in view of the history of disputes among them (at least as reported in the press; see, e.g., https://cityroom.blogs.nytimes.com/2009/04/15/rental-practices-at-chinatown-mall-raises-questions/; https://www.nydailynews.com/news/chinatown-businesses-exploited-city-owned-property-bloomberg-administration-ignores-plight-article-1.411943; http://pavementpieces.com/chinatown-shop-owner-fights-landlord-wins/). Finally, Paragraph 9 of the First Lease Amendment provides that

16

upon termination of the Debtor's leasehold interest, the leasehold mortgagee, Bank of Hope, has the right to elect to enter into a new lease with the City for the Premises upon the same terms, provided it pays all arrears. Accordingly, a safe and efficient transition can be accomplished in these circumstances.

### The Debtor Cannot Assume the Lease Under Section 365(b)(2) Because It Cannot Cure Defaults or Provide Adequate Assurance of Future Performance

42. Where there has been a default in an agreement, the debtor's right to assume under Section 365(a) is conditioned on its obligations to cure the defaults and to provide adequate assurance of future performance under such contract or lease. Section 365(b)(1)(B),(C). Even if the Court were to grant the extension of time requested by the Debtor, the Debtor would not be able to assume the Lease, for several reasons.

43. **The Debtor Cannot Promptly Cure Defaults Under Section 365(b)(1).** Where there has been a default, the debtor's right to assume an executory contract or unexpired lease pursuant to Section 365(a) is conditioned on its obligations to cure defaults and to compensate the non-debtor party for any actual pecuniary loss resulting from such default. Section 365(b)(1)(A), (B).

> The purpose of § 365(b)(1) is "to restore the 'debtor-creditor relationship . . . to pre-default conditions,' bringing the [loan] back into compliance with its terms." *In re U.S. Wireless Data, Inc.*, 547 F.3d 484, 489 (2d Cir. 2008) (quoting *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982) and citing 3 Collier on Bankruptcy § 365.05[3], 365-54 (15th ed. rev. 2008)).

*In re DBSI, Inc.,* 405 B.R. 698, 704 (Bankr. D. Del. 2009).

44. In this case, as noted above, the Debtor was in default in its pre-petition obligations under the Lease in the amount of at least $8,800,000.00; its post-petition defaults amounted to at least

17

$440,000.00, both based on the City's current calculations derived from its books and records. Clearly, the Debtor has no resources or ability to cure these defaults, or address even a portion of them.

45. **The Debtor Cannot Provide Adequate Assurance of Future Performance.** The Debtor here is also unable to give adequate assurance of future performance. As noted above, the Debtor has admitted that it "cannot afford to pay" the full amounts called for under the Lease, including the PILOT component, and it does not propose to do so, even on an interim basis. Motion, ¶10. The Debtor, apparently, would like to assume the Lease with only the Base Rent component, while, in effect, rejecting the PILOT obligation. However, it is indisputable that a contract or lease can only be assumed in its entirety; the debtor may not pick and choose among the benefits and obligations that it would like to take on. *See, e.g., Nat'l Labor Relations Board v. Bildisco and Bildisco (In re Bildisco and Bildisco)*, 465 U.S. 513, 531-32, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*. . . .") (citation omitted); *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits."). Because the Debtor here admittedly cannot give adequate assurance that it will be able to perform the entire contract, it cannot assume the Lease.

46. **No Further Extension Is Allowed Without the City's Prior Written Consent.** As noted above, Section 365(d)(4)(B)(ii) provides that "[i]f the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance." See e.g., *Condal Distribs., Inc. v 2300 Xtra Wholesalers, Inc (In re 2300 Xtra Wholesalers, Inc.)*, 445 B.R. 113, 121-122 (S.D.N.Y. 2011). Accordingly, here, no extension beyond

the February 9 Extension Date would be allowed unless the City consented in writing. At this time, it appears extremely unlikely that the City would be prepared to consent to a further extension.

47. **The Court Should Deny the Extension at This Time**. For all the reasons discussed above, the City respectfully requests that the Court deny the extension beyond the November 11 Deadline requested in the Debtor's Motion. Further, the City requests that the Court determine that the Lease shall be deemed rejected pursuant to Section 363(d)(4) as of the November 11 Deadline, and that the Debtor shall immediately thereafter surrender the real property to the City.

WHEREFORE, the City respectfully requests that the Court: (I) deny in all respects the Debtor's Motion; and (II) grant to the City such other and further relief as the Court determines to be just.

Dated:    New York, New York
          October 31, 2019

        GEORGIA M. PESTANA
        Acting Corporation Counsel of the City of New York
        Attorney for the City of New York and
        The New York City Department of Citywide Administrative Services
        100 Church Street
        New York, New York 10007
        Tel.: (212) 356-2113
        e-mail: zkass@law.nyc.gov

        By:   /s/ Zachary B. Kass
                  Zachary B. Kass (ZK-1944)
                  Senior Counsel