<u>AMENDED AND RESTATED LEASE</u>

BETWEEN

THE CITY OF NEW YORK
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES
REAL ESTATE SERVICES
1 CENTRE STREET, 20TH FLOOR NORTH
NEW YORK, NEW YORK 10007

&

BROADWAY EAST GROUP, LLC
1120 Old Country Road, Suite 203
Plainview, New York 11803

---

Premises: Known as East Broadway Mall
88 East Broadway
New York, NY
Block: _____ Lot:_____
Borough of Manhattan

---

*****

| ARTICLE | CAPTION | PAGE |
|---|---|---|
| ARTICLE 1 | LEASE AMENDED AND RESTATED IN ITS ENTIRETY; PREMISES | 2 |
| ARTICLE 2 | TERM; RENT | 3 |
| ARTICLE 3 | OPTION TO RENEW | 4 |
| ARTICLE 4 | EXISTING SUBTENANTS | 4 |
| ARTICLE 5 | USE | 6 |
| ARTICLE 6 | BASE RENT; ADDITIONAL RENT INCLUDING PILOT | 8 |
| ARTICLE 7 | LATE CHARGES | 13 |
| ARTICLE 8 | SECURITY DEPOSIT | 14 |
| ARTICLE 9 | ASSIGNMENT AND SUBLETTING | 15 |
| ARTICLE 10 | PREMISES ACCEPTED AS IS; NO LANDLORD'S WORK | 21 |
| ARTICLE 11 | TENANT IMPROVEMENTS, INSTALLATIONS AND ALTERATIONS | 21 |
| ARTICLE 12 | REPAIRS AND MAINTENANCE | 26 |
| ARTICLE 13 | IMPOSITIONS AND UTILITIES | 29 |
| ARTICLE 14 | QUIET ENJOYMENT | 31 |
| ARTICLE 15 | COMPLIANCE WITH LAWS; HAZARDOUS MATERIALS | 32 |
| ARTICLE 16 | INSURANCE | 33 |
| ARTICLE 17 | Indemnification | 44 |
| ARTICLE 18 | DAMAGE OR DESTRUCTION | 46 |
| ARTICLE 19 | CONDEMNATION | 49 |
| ARTICLE 20 | ENTRY | 50 |
| ARTICLE 21 | DEFAULTS | 51 |
| ARTICLE 22 | BANKRUPTCY; ADDITIONAL DEFAULT PROVISIONS | 52 |
| ARTICLE 23 | REMEDIES OF LANDLORD | 54 |
| ARTICLE 24 | ATTORNEY'S FEES | 55 |
| ARTICLE 25 | OTHER FEES AND EXPENSES | 55 |
| ARTICLE 26 | NO WAIVER | 56 |
| ARTICLE 27 | LANDLORD'S REMEDIES CUMULATIVE | 57 |
| ARTICLE 28 | SURRENDER | 57 |
| ARTICLE 29 | DAMAGES FOR FAILURE TO SURRENDER POSSESSION | 58 |
| ARTICLE 30 | VAULTS | 59 |
| ARTICLE 31 | JURY WAIVER AND COUNTERCLAIMS | 59 |
| ARTICLE 32 | ESTOPPEL CERTIFICATES | 60 |
| ARTICLE 33 | NOTICES | 60 |
| ARTICLE 34 | NO DISCRIMINATION | 62 |
| ARTICLE 35 | INVESTIGATIONS | 65 |
| ARTICLE 36 | FORCE MAJEURE | 68 |
| ARTICLE 37 | ENTIRE AGREEMENT | 70 |
| ARTICLE 38 | NO SURRENDER WITHOUT WRITTEN AGREEMENT | 70 |
| ARTICLE 39 | MISCELLANEOUS | 70 |
| ARTICLE 40 | LANDLORD'S CONSENT | 72 |
| ARTICLE 41 | TENANT REPRESENTATIONS | 73 |
| ARTICLE 42 | TENANT'S SIGNAGE | 73 |
| ARTICLE 43 | LANDLORD'S SIGNAGE | 75 |

EXHIBITS

EXHIBIT "X"  List of Existing Subtenants
EXHIBIT "Y"  Scope of Work

THIS **LEASE AGREEMENT** (this "**Lease**")**,** entered into as of the           day of

, 20     (the "**Effective Date**") between **THE CITY OF NEW YORK,** as landlord (hereinafter

designated as "**Landlord**" or the "**City**"), a municipal corporation of the State of New York, acting

by and through its Commissioner of Citywide Administrative Services (the "**Commissioner**"),

having an office at 1 Centre Street, New York, New York 10007, and Broadway East Group, LLC.,

a Delaware Limited Liability Company, having an office at 1120 Old Country Road, Suite 203,

Plainview, NY 11803 as tenant (hereinafter referred to as "**Tenant**" ).

## W I T N E S S E T H:

**WHEREAS,** Landlord and East Broadway Mall, Inc. ("**Former Tenant**") are parties to

that certain agreement of lease, dated March 1, 1985 (such lease, as previously amended and

modified on November 21, 1995, the "**Original Lease**") with respect to the entire parcel of land

described as Lot 282 in the Block 44 as shown on the tax map of the Borough of Manhattan (the

"**Land**") and the building located thereon (the "**Building**"); and

**WHEREAS,** Tenant has assumed the obligations of the Former Tenant under the

Original Lease, pursuant to an Assignment of Lease dated of even date herewith; and

**WHEREAS,** Landlord and New York City Land Development Corporation

("**NYCLDC**") are parties to that certain agreement of lease, dated of even date herewith,

commencing on October 1, 2035 (the "**New Lease**") with respect to the Premises (as defined

herein below); and

**WHEREAS,** Tenant has assumed the obligations of NYCLDC under the New Lease,

pursuant to an Assignment of Lease dated of even date herewith; and

**WHEREAS**, Landlord and Tenant hereby intend to consolidate, amend and restate the

1

Original Lease and New Lease in their entirety in accordance with the terms and conditions set forth below, for and in consideration of the rent and additional rent to be paid, construction/improvement obligations and the mutual covenants and agreements of the parties, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties; and

**WHEREAS**, the New Lease was subject to a public hearing dated _____ __, 2023 and Mayoral approval pursuant to Section 384 of the New York City Charter was received on _____ __, 2023; and

WHEREAS, the Former Tenant commenced a Proceeding seeking protection from its obligations under the Original Lease in the Bankruptcy Court for the Southern District of New York on --- which resulted in a Court Order permitting the amendment and restatement of the Original Lease and the assignment thereof to Tenant; and

WHEREAS, by hearing pursuant to ------, the City obtained authorization for the payment terms and the term of years of this Lease.

**NOW, THEREFORE** the terms of the Lease are mutually agreed as follows:


## ARTICLE 1

## LEASE AMENDED AND RESTATED IN ITS ENTIRETY; PREMISES

A.    Landlord and Tenant hereby amend and restate the Original Lease and New Lease in their entirety in accordance with the terms and conditions set forth below, and from and after the Effective Date hereof, the provisions of the Original Lease and New Lease shall be deemed superseded and replaced in their entirety by the provisions of this Lease.

B.    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the

2

entire Land and the entire Building beneath the Manhattan Bridge, known as 88 East Broadway, described as Block 282, Lot 44, on the tax map of the Borough of Manhattan (the "**Premises**").

C.      Notwithstanding the foregoing, Tenant shall not be subject to any unpaid rent, unpaid wages, and lawsuits of the prior tenant under the Lease, unless specified in this Lease.

**TO HAVE AND TO HOLD** said Premises unto Tenant, subject to the agreements, terms and conditions herein contained.

## ARTICLE 2

## TERM

A.      <u>Term.</u>  The initial term of this Lease (the "**Initial Term**") shall commence on the Effective Date (the "**Commencement Date**") and shall expire at 11:59 p.m. on the date immediately preceding the twentieth (20th) anniversary of the Commencement Date (the "**Initial Expiration Date**"), as the same may be extended pursuant to <u>Article 3</u> below or upon such earlier date as this Lease may be terminated as provided herein (the "**Expiration Date**").  The Initial Term, as may be extended, and as may be earlier terminated, is hereinafter referred to as the "**Term**."  The term "**Lease Year**" as used herein shall mean each period of twelve (12) consecutive months, beginning on each anniversary of the Commencement Date and ending at 11:59 p.m. of the day immediately before the anniversary of each succeeding year of the Lease Term (i.e., the Initial Term or the Renewal Term as defined in <u>Article 3</u>, as the case may be) following the Commencement Date.

## ARTICLE 3

## OPTION TO RENEW

A.      Subject to the limitations set forth in <u>Section 3(B)</u> below, Tenant shall have one (1) option to renew this Lease ("**Renewal Option**") for one additional term of ten (10) years (the "**Renewal Term**") commencing on the date immediately following the Initial Expiration Date (the "**Renewal Commencement Date**") on all of the same terms and conditions set forth in this Lease including the continuation of 3% increases in the Base Rent (defined in <u>Article 6</u>) which commence on the third (3rd) anniversary of Commencement Date

B.      Tenant shall exercise the Renewal Option by giving written notice thereof to Landlord not less than one hundred eighty (180) days but not more than three hundred sixty (360) days prior to the expiration of the Initial Term.  Tenant's exercise of the Renewal Option will be effective only if (1) Tenant provides the written notice within the timeframe set forth above with TIME BEING OF THE ESSENCE and (2) at the time of exercise and renewal Tenant is not in default of any of the terms of the Lease beyond any applicable cure period.

## ARTICLE 4

## EXISTING SUBTENANTS

A.      The Tenant shall continue to rent to each Existing Subtenant (as defined below), whether they have an existing sublease or are renting space under a month-to-month agreement or other payment agreement with the Former Tenant (any such sublease or agreement shall be referred to herein as an "**Existing Sublease**").  The names of the Existing Subtenants are identified in **Exhibit "X",** attached hereto and made part hereof (individually "**Existing Subtenant**" and collectively, "**Existing Subtenants**").  Said Exhibit "X" also indicates the

4

applicable space occupied by such Existing Subtenant in the Premises as of the date hereof (**"Existing Subtenant Space"** and identified on **Exhibit "X"**) and the existing rental rate paid by such Existing Subtenant ("**Existing Rental Rate**" and identified on **Exhibit "X"**). Tenant shall memorialize its agreement with each of the Existing Subtenants in writing in the format of a sublease ("**Existing Subtenant Sublease**") approved by Landlord, and each Existing Subtenant Sublease shall clearly define the term of the sublease and the amount of rent and additional rent to be paid by each Existing Subtenant, and shall be submitted to the Landlord within thirty (30) days from Lease execution. All future subleases with either the Existing Subtenants or with new subtenants must be memorialized in writing and submitted to Landlord within thirty (30) days of execution of same.  All subleases must be in compliance with the terms of this Lease and each sublease shall provide that it is subordinate and subject to the Lease.

B.    Except as expressly otherwise provided herein, the Tenant hereby agrees and covenants that (i) for the period commencing on the date hereof and expiring two (2) years after the date hereof (such period being referred to herein as the "Existing Subtenant Restriction Period"), Tenant shall continue to charge each Existing Subtenant the applicable Existing Rental Rate for its Existing Subtenant Space and continue to provide a space to each Existing Subtenant at least equal in size to their Existing Subtenant Space; (ii) continue to honor all terms of each Existing Subtenant's Existing Sublease or terms of occupancy, as the case may be, and (ii) Tenant shall not interfere with the occupancy of the Existing Subtenants during the Existing Subtenant Restriction Period so long as each such Subtenant is in compliance with the applicable provisions of this Lease and the provisions of their respective Existing Subtenant Sublease.

C.    Notwithstanding the foregoing, if during the Existing Subtenant Restriction Period an Existing Subtenant (i) fails to pay rent when due and such failure is not cured within

thirty (30) days after notice to such Existing Subtenant by Tenant, or after such applicable period

of time specified in such Existing Subtenant's Existing Subtenant Sublease, or (ii) if the Existing

Subtenant is in default of any applicable provision of this Lease or its Existing Subtenant

Sublease, if any, then upon giving a forty-five (45) day written notice to cure to the Existing

Subtenant and written notice of default to the Landlord, the Tenant may avail itself of all judicial

remedies available by reason of such default with respect to such defaulting Existing Subtenant,

unless the Existing Subtenant has cured or commenced to diligently cure such default within the

thirty (30) day time frame.

## ARTICLE 5

### USE

A.       The Premises shall be used only for the following purposes and no

other purposes: The development and operation of a first class retail mall containing

(1)      retail stores;

(2)      commercial offices;

(3)      such other uses agreed to in writing by Landlord which are

(i) in accordance with applicable law and zoning and City policy; (ii) are in furtherance of the

development of a retail commercial center; and (iii) do not adversely affect the general

community in relation to vehicular or pedestrian traffic, pollution, safety, noise and cleanliness.

In the event Landlord determines that the use requested by Tenant may adversely affect the

general community as aforesaid, Tenant shall address the problems that may result therefrom in a

manner acceptable to Landlord as a condition of Landlord giving its written consent thereto.

The following uses are expressly prohibited: [TBD – waiting for confirmation from Law

6

Department]

1) for the sale of tobacco or tobacco products, or electronic cigarettes or any products containing CBD or THC;
2) as a gambling establishment of any kind, including but not limited to arcades, slot machines, game rooms, billiard halls, off track betting or other sports betting;
3) for sale, exhibition, display or use or repair of firearms, explosive devices or for sale of materials that could be used to make an explosive device or firearm;
4) to sell, rent or view pornography or other sexual material or devices;
5) to operate massage parlors, or brothels or provide any sexual services whatsoever:
6) to operate as an adult physical culture establishments of any kind, a night club, a discotheque or cabaret of any kind or nature

B.      Tenant's use of the Premises shall be in complete conformity with the present or future Certificate of Occupancy and any other applicable governmental laws, rules and regulations.

C.      Tenant shall not place a load upon any floor of the Premises which exceeds the floor load per square foot area which such floor was designed to carry and which is allowed by law. If Tenant shall desire a floor load in excess of that specified for any portion of the Premises, Tenant, at its expense, may strengthen and reinforce the same so as to carry the live load desired, provided Tenant shall submit to Landlord, and obtain its approval of, the plans showing the location of and the desired live floor load for the areas in question, and provided further that any such desired floor load is permitted by law and provided further any such strengthening and reinforcement will not adversely affect the structure. Landlord reserves the right to prescribe the weight and position of all safes and heavy installations which Tenant wishes to place in the Premises so as properly to distribute the weight thereof. If Tenant refuses to place such safes and heavy installations in such places as Landlord shall prescribe, then Landlord may require Tenant to provide reinforcement of the floors or to provide other reasonable means satisfactory to Landlord for the proper distribution of such weight. Business

7

machines and mechanical equipment used by Tenant which cause vibration or noise which may

be transmitted to the Building structure or to any leased space therein to such a degree as to be

reasonably objectionable to Landlord or to any tenant in the Building shall be placed and

maintained by Tenant, at its expense, in settings of cork, rubber, or spring type vibration

eliminators sufficient to eliminate such vibration or noise.

D.     Tenant shall not use or occupy, nor permit or suffer the Premises or any part

thereof to be used or occupied for any unlawful purpose, or for any business, use or purpose

deemed by Landlord to be disreputable or extra-hazardous, or in such a manner as to constitute a

nuisance of any kind (public or private), that Landlord deems offensive by reason of odors,

fumes, dust, smoke, noise or other pollution, or for any purpose or in any way in violation of the

certificate of occupancy issued for the Building or of any present or future governmental laws,

ordinances, requirements, orders, directions, rules or obligations, or which may make void or

voidable any insurance then in effect on the Premises and/or which in violation of the activities

that are prohibited by this Lease.    Immediately upon the discovery of any such unlawful, illegal,

disreputable or extra-hazardous Tenant shall take all necessary steps, legal and equitable, to

compel the discontinuance of such use and to oust and remove any Subtenants utilizing the

Premises for such unlawful, illegal, disreputable, extra-hazardous use and/or in violation of the

activities prohibited by this Lease.

## ARTICLE 6

## BASE RENT; ADDITIONAL RENT INCLUDING PILOT

A.     Base Rent. Tenant shall pay to Landlord, in the manner set forth in Section

6(J)(1), the fixed annual rent ("**Base Rent**") set forth below, in equal monthly installments, in

8

advance on the first day of every calendar month during the Lease Term, without any set-off or

deduction whatsoever except as expressly provided in this Lease, except that if the first and/or

last months of the Term are partial calendar months, the Base Rent therefor shall be prorated.

B.   Calculation of Base Rent.  Commencing on the Commencement Date, the total

amount of annual Base Rent payable to Landlord by Tenant for the Premises during the Initial

Term shall be Four Hundred Fifty Thousand and 00/100 Dollars ($450,000.00) per annum for the

period beginning on the Commencement Date and ending on the date that is the date

immediately preceding the third (3rd) anniversary of the Commencement Date.

C.   Base Rent shall be escalated at the rate of 3% per annum of the Base Rent for

the previous year, such escalations to commence immediately after the third (3rd) anniversary of

the Commencement Date.

D.   Additional Rent.  Tenant shall also pay, as provided in the Lease or on demand of

Landlord, as "**Additional Rent,**" all other amounts, liabilities and obligations which Tenant

herein assumes or agrees to pay under this Lease, specifically including, but not limited to,

PILOT.  The terms "**Rent**" or "**rent**" as used herein shall collectively mean Base Rent and

Additional Rent.  In the event of any failure on the part of Tenant to pay any Rent required

herein, Landlord shall have all the rights, powers and remedies provided for in this Lease or at

law or in equity or otherwise in the case of nonpayment of rent.

E.   PILOT.        (1)  Landlord and Tenant hereby acknowledge that so long as The City

of New York is the owner of the Premises, no Real Estate Taxes (defined below) may be imposed on

the Premises.  Having acknowledged such fact, Tenant hereby agrees to make payments in lieu of

taxes ("**PILOT**") to Landlord in the full amount of the Real Estate Taxes, as defined in subsection

(c), below, that would have been imposed based on the then current rate and assessed value of the

9

Premises for each New York City fiscal year contained in the Term of this Lease had the property been owned by an entity subject to the payment of Real Estate Taxes, as determined by the New York City Department of Finance.  Such payments shall be made in twelve equal monthly installments at the beginning of each month along with the payment of Base Rent, as Additional Rent.  In the event the month in which this Lease commences or ends (i.e., expires or earlier terminates) is a partial calendar month, the amount of such monthly PILOT payment shall be pro-rated.

(a)    **Initial PILOT Amount**.  After the Rent Concession End Date, as defined below, the Initial PILOT amount due shall be based on an actual assessment of Real Estate Taxes by the New York City Department of Finance.

(b)    **Tax Contest**.  Tenant shall continue to pay the full amount of PILOT required under this Section 6(E), notwithstanding that Tenant may have instituted (and is hereby granted permission by Landlord to so institute) tax assessment reduction or other actions or proceedings to reduce the assessed valuation of the Premises or any portion thereof.  If any such tax reduction or other action or proceeding shall result in a final determination in Tenant's favor, Tenant shall be entitled to a credit against future PILOT to the extent, if any, that the PILOT previously paid for a New York City fiscal year for which such final determination was made exceeds PILOT as so determined.  If, at the time Tenant is entitled to receive such credit, the City is paying interest on refunds of Real Estate Taxes, Tenant's credit shall include interest at the rate then being paid by the City.  In no event, however, shall Tenant be entitled to any

10

cash refund for any such excess from Landlord, except that, Tenant shall be entitled to any such refund in case at, to the extent not credited prior thereto, the Expiration Date.

(c)    The term "**Real Estate Taxes**" as used herein shall mean all taxes assessed or imposed upon the Building and the Land by state or local government.

F.    <u>Rent and PILOT Concession</u>. No Base Rent or PILOT payments shall be due and payable for the first sixteen (16) months from Commencement Date **("Rent Concession Period.")** Base Rent and PILOT payments shall commence on the five hundred forty fifth (545th) day from the Commencement Date ("**Rent Concession End Date**").  Tenant acknowledges that the Base Rent and PILOT Concession Period is given in consideration of Tenant's agreement to spend a minimum of $5,000,000.00 on capital improvements to the Premises, as set forth in Exhibit "Y" hereto and Tenant's payment to Landlord of $2,000,000.00, as further described below.

Leasehold financing shall not be permitted during the Rent Concession Period. Any future requests for leasehold financing upon expiration of such Rent Concession Period shall be subject to Landlord's approval and must relate to the Building/site improvements. Leasehold financing may not be used as collateral for any other property in Tenant's possession.

G.    <u>One-Time Payment</u>.

i.    Tenant shall make a one-time payment to Landlord of $2,000,000.00, and shall not be liable for any outstanding Base Rent and Additional Rent due and owing from Former Tenant to Landlord under the Original Lease. Payment shall be due upon Lease execution.

11

H.    Third Party Payments.  Payment of Rent may not be made by a third party unless Tenant has received Landlord's prior written permission therefor.  In no instance shall payment of Tenant's Rent by a third party create a landlord-tenant relationship between Landlord and the third party nor shall such payments in any way whatsoever affect Tenant's sole responsibility for payment of its monthly Rent.

I.    Use and Occupancy.  Tenant shall pay use and occupancy for the Premises during the period it remains in possession after expiration or sooner termination of this Lease at one of the following rates, which shall be recalculated for each successive twelve (12) month period at one of the following rates in the sole determination of Landlord: (1) 150% of the Base Rent payable for the last month of the Lease Term subject to additional 150% increases for every two year period that Tenant continues use and occupancy of the Premises beyond the expiration or earlier termination of this Lease; (2) the fair market value of the Base Rent as established by Landlord's appraisal; or (3) the rate established by the successful bid at an auction of the Premises, if there is one, held subsequent to expiration or sooner termination of this Lease.  Tenant shall pay this use and occupancy on the first day of each month during the period Tenant remains in possession.  These monthly payments shall be deposited in escrow pending determination of any proceedings against Tenant brought by Landlord to regain possession of the Premises. The acceptance of any payment shall not prejudice Landlord in any action to regain possession.

J.    Payment Procedures.

(1)    All Rent shall be payable to Landlord either (a) by check drawn upon a New York City bank that is a member of the New York Clearing House Association or any successor thereto at the following address (subject to change by Landlord from time to time):

The City of New York

12

Department of Citywide Administrative Services
Real Estate Services
1 Centre Street, 20th Floor North
New York, New York 10007
Attention:  Executive Director, Real Estate Financial Services

or (b) by electronic funds transfer to such bank account or accounts as Landlord shall designate from time to time. If Tenant is in default of its Lease, Landlord has, at its option, the right to refuse to allow Tenant access to the electronic payment system and thus any payment to Landlord must be made by check; however, Landlord reserve the right to reject payment and return any check after receipt, at its option.  Should Landlord accept check, the payment will be applied to the outstanding amount due, but will not constitute a waiver with respect to any outstanding payments owed and/or any other defaults under the Lease.

(2)     All payments of Base Rent shall be due and payable whether billed or not billed to Tenant by Landlord.  If Tenant fails to pay Landlord the full Base Rent and all Additional Rent due, any subsequent payments may, at Landlord's sole discretion, first be applied to rent arrears.

(3)     If Tenant's payments of Base Rent and/or Additional Rent are not honored twice in a six-month period, Tenant shall make the second dishonored payment and all rent payments for the next six (6) months by certified or bank check unless otherwise indicated by Landlord in writing.  Nothing contained herein, however, shall be deemed to prevent Landlord from holding Tenant in default under this Lease upon the dishonor of any of Tenant's payments.  Tenant must pay Landlord a fee in the amount of Fifty Dollars ($50) for each dishonored rent check or money order, which fee shall be collectible as Additional Rent.

**ARTICLE 7**

13

**LATE CHARGES**

If any payment of Rent payable by Tenant under this Lease shall become overdue for ten (10) days, a late charge of 1.5% per month shall be imposed upon Tenant on the sums overdue and? shall become immediately due and payable to Landlord for Tenant's failure to make prompt payment. Such late payment charge shall be compounded monthly and shall be collectible as Additional Rent.   In the event of non-payment of any late charges, Landlord shall have all the rights and remedies provided for herein and by law in the case of non-payment of Base Rent.  No failure by Landlord to insist upon the strict performance by Tenant of its obligations to pay late charges shall constitute a waiver or relinquishment by Landlord of its right to enforce the provisions of this Article.

**ARTICLE 8**

**SECURITY DEPOSIT**

Tenant shall deposit with Landlord a sum equal to three (3) months' Base Rent through a certified or official bank check drawn to the order of the Comptroller of the City of New York for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease; thereafter, as the Base Rent increases during the Term of this Lease, Tenant shall deposit such additional amounts as may be required in order to maintain a security deposit equal to the then current three (3) months' rent.  It is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of Base Rent and Additional Rent, Landlord may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any Base Rent or Additional Rent or any other sum as to which Tenant is in default or for any sum which Landlord

14

may expend or may be required to expend, including attorneys' fees, by reason of Tenant's

default in respect of any of the terms, covenants and conditions of this Lease, including, but not

limited to, any damages or deficiency in the re-letting of the Premises, whether such damages or

deficiency accrued before or after summary proceedings or other re-entry by Landlord.  In the

event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants

and conditions of this Lease, the security shall be returned to Tenant, without interest, after the

date fixed as the end of the Lease and after delivery of entire possession of the Premises to

Landlord.  In the event of a sale of the Land and Building or leasing of the Building or any

portion thereof, Landlord shall have the right to transfer the security to the vendee and Landlord

shall thereupon be released by Tenant from all liability for the return of such security; and

Tenant agrees to look to the new Landlord solely for the return of said security; and it is agreed

that the provisions hereof shall apply to every transfer or assignment made of the security to a

new Landlord.  Tenant further covenants that it will not assign or encumber or attempt to assign

or encumber the money deposited herein as security and that neither Landlord nor its successors

or assigns shall be bound by any such assignment, encumbrance, attempted assignment or

attempted encumbrance.

## ARTICLE 9

## ASSIGNMENT AND SUBLETTING

A.          For the purposes of this Article 9, a "**Sublease**"  shall mean an agreement

for the subleasing portions of the property for commercial or retail purposes, unless such

agreement constitutes a Major Sublease, as defined below.

B.      "**Major Sublease**" means the transfer of control and management of the Premises

15

or a sublease of at least a total of 12,000 square feet of rentable space to a single Subtenant,

excluding utility areas, of the Premises.

C.     "Subtenant" shall mean an individual or a commercial entity subleasing a portion

of the Premises for retail or commercial purposes pursuant to a separate agreement with Tenant.

D.     Tenant, for itself, its legal representatives, successors and assigns, expressly

covenants that it shall not assign, mortgage or encumber this Lease or enter into a Major

Sublease, or suffer or permit the Premises or any part thereof to be used by others (excluding

retail or commercial Subtenants), without the prior written consent of Landlord in each instance.

Neither shall it, without the prior written consent of Landlord, sell, assign or transfer any of the

issued or outstanding capital stock of any corporation which is Tenant under this Lease; nor shall

it issue additional stock in any such corporation so as to result in a change of the stock ownership

of such corporation as held by the shareholders thereof on the date when such corporation

became Tenant under this Lease pursuant to the terms hereof; nor shall any general partner sell,

assign or transfer its interest in a partnership which is Tenant under this Lease; nor shall a limited

or general partnership (or a Tenant comprised of two (2) or more persons individually or as co-

partners) change or convert Tenant to any of the following entities ("**Limited Liability Entity**"):

(i) a limited liability company, (ii) a limited liability partnership, or (iii) any other entity which

possesses the characteristics of limited liability.  If Tenant transfers any of the interests described

in this Article without the prior written consent of Landlord, Tenant shall be deemed to have

"assigned" this Lease within the meaning of the term as used in this Article.  This shall be

deemed an event of default.

E.     The foregoing notwithstanding, with prior written consent of the Landlord, which

shall not be unreasonable withheld, Tenant may assign the Lease to an affiliate of Tenant, of

16

which Tenant retains control ("**Affiliate**").

F.      If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by any individual or entity other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, sublessee or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, subleasing, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, sublessee or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.  The consent by Landlord to an assignment (including, without limitation, an assignment of this Lease to an Affiliate) or Major Sublease  shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or  Major Sublease.

G.      No assignment or  Major Sublease shall be binding upon Landlord unless and until there shall be delivered to Landlord an instrument of assignment or  Major Sublease.  The instrument of assignment shall be in recordable form which shall also contain a covenant of assumption by the assignee of all of the obligations of Tenant under this Lease.

Tenant shall also deliver to Landlord a copy of each new Sublease within thirty (30) days of execution of same with Subtenant.

H.      No amendment to any assignment or Major Sublease shall be executed without the prior written consent of Landlord to such amendment in each and every instance and no such amendment shall be binding upon Landlord unless and until there shall be delivered to Landlord the instrument amending the assignment or  Major Sublease following Landlord's consent.

I.      Any consent to any assignment, mortgage, encumbrance, or  Major Sublease which may be given by Landlord shall not constitute a waiver by Landlord of the provisions of

17

this Article or relieve Tenant of its obligation and/or liability for the full performance by it of the covenants of this Lease on the part of Tenant to be performed; and any consent given by Landlord to any assignment, mortgage, encumbrance or Major Sublease shall not relieve Tenant from obtaining the written consent of Landlord to any subsequent assignment, mortgage, encumbrance or Major Sublease if such consent is required under the provisions of this Article.

J.     In the event that Tenant wishes to assign or enter into a Major Sublease for the whole or any portion of the Premises pursuant to this Article, Tenant shall provide to Landlord with its application for Landlord's consent thereto the following, subject to the terms herein:

(i)     completed disclosure forms from the proposed assignee or sublessee;

(ii)     a copy of the proposed assignee's or sublessee's Certificate of Incorporation, if applicable;

(iii)     detailed plans for the proposed assignee's or sublessee's intended use of the Premises in conformity with Article 5, hereinabove;

(iv)     a description of the proposed assignee's or sublessee's financial ability to pay the rent herein and any other monetary obligations under the Lease;

(v)     a certified financial statement for the past two (2) years for the proposed assignee or sublessee; and

(vi)     any agreement or proposed agreement with the proposed assignee or sublessee;

(vii)     a certification by the proposed assignee or sublessee that it has not been in default of any City obligations for the past five (5) years.

Notwithstanding the foregoing, the decision whether or not to consent to any assignment or Major Sublease or amendment(s) thereto shall be in Landlord's sole and absolute discretion.

18

K.      If applicable, in the event Tenant wishes to convert to a Limited Liability Entity,

Landlord agrees not to unreasonably withhold or delay its consent provided that: (i) the Limited

Liability Entity succeeds to all or substantially all of Tenant's business and assets; (ii) the

Limited Liability Entity has a net worth ("**Net Worth**") determined in accordance with generally

accepted accounting principles of not less than the greater of Tenant's Net Worth on (1) the date

of execution of the Lease, or (2) the day immediately preceding the date of such conversion; (iii)

Tenant is not in default of any of the terms, covenants or conditions of the Lease on the date of

such conversion; and (iv) each partner of Tenant shall execute and deliver to Landlord an

agreement, in form and substance satisfactory to Landlord, under which each partner agrees to

remain personally liable for all of the terms, covenants and conditions of the Lease.

L.      Any violation of any provision of this Lease by any assignee or sublessee shall be

deemed a violation of such provision by Tenant.  Reference anywhere else in this Lease to an

assignee or subtenant shall not be considered as a consent by Landlord to an assignment or a

Major Sublease nor as a waiver of the restriction against the same except as expressly provided

in this Article.

M.      (1)      If Landlord shall give its consent to any Major Sublease, except to

Subtenants for retail purposes, or to any assignment of this Lease, Tenant shall, in consideration

therefor, pay to Landlord as Additional Rent an amount equal to fifty (50%) percent of the

Sublease Profit (hereinafter defined) or fifty (50%) percent of Assignment Profit (hereinafter

defined), as the case may be.

(2)      For purposes hereof, the term "**Assignment Profit**" as used herein shall

mean an amount equal to all sums and other considerations paid to Tenant by the assignee for or

by reason of such assignment including, but not limited to, sums paid for the sale or rental of

19

Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a sale thereof, the then net unamortized or undepreciated portion (determined on a straight-line basis over the Term of this Lease) of the amount, if any, by which the original cost thereof exceeded any amounts paid for or contributed by Landlord which were applied or could have been applied by Tenant against such original cost pursuant to the terms of this Lease.

(3)     For purposes hereof, the term "**Sublease Profit**" as used herein shall mean in any year of the Term of this Lease (a) any rents, additional charges or other consideration payable under a Major Sublease to Tenant by the sublessee which is in excess of the Base Rent and recurring Additional Rent accruing during such year of the term of this Lease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof, and (b) all sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture or other personal property, less, in the case of the sale thereof, the then net unamortized or undepreciated portion (determined on a straight-line basis over the term of this Lease) of the amount, if any, by which the original cost thereof exceeded any amounts paid for or contributed by Landlord which were applied or could have been applied by Tenant against such original cost pursuant to the terms of this Lease, which net unamortized amount shall be deducted from the sums paid in connection with such sale in equal monthly installments over the balance of the term of the Major Sublease (each such monthly deduction to be in an amount equal to the quotient of the net unamortized amount, divided by the number of months remaining in the term of this Lease).

(4)     The sums payable under this Section 9(L) shall be paid to Landlord at

the time the Base Rent is payable to Landlord from the assignee or at the time the Base Rent is payable to Tenant from the sublessee, as applicable.

## ARTICLE 10

## PREMISES ACCEPTED AS IS; NO LANDLORD'S WORK

A.      Tenant has inspected the Premises and is thoroughly acquainted with its condition and agrees to take same "as is" on the date hereof and acknowledges that the taking of possession of the Premises shall be conclusive evidence that the Premises are in satisfactory condition. Other than as expressly set out herein, neither Landlord nor any of Landlord's officials or employees has made any representations with respect to the physical condition of the Premises either on the date hereof or during the Term of this Lease, or of the present or future suitability of the Premises for any use or any permits, rights or permissions with respect thereto and no rights, easements or licenses are acquired by Tenant by implication or otherwise.

B.      Landlord shall not be obligated to make any alterations, additions or improvements to the Premises whatsoever prior to or during the Term of this Lease.

## ARTICLE 11

## TENANT IMPROVEMENTS, INSTALLATIONS AND ALTERATIONS

A.      Tenant shall make capital alterations and capital improvements to the Premises in an amount not less than Five Million Dollars ($5,000,000.00) within sixteen (16) months of Commencement Date in accordance with the Scope of Work, annexed as Exhibit "Y" hereto ("Improvements"). Should tenant receive any grants or money for the purposes of Improvements of the Property that has no repayment obligations, tenant shall use that money to make improvements to the Premises over and above Tenant's payment of $5,000,000 towards the Improvements.

21

Tenant must demonstrate to Landlord that it expended an amount not less than Five Million Dollars ($5,000,000.00) on Improvements. The amount expended shall be determined by Landlord based upon construction documents, invoices, labor time sheets, canceled checks, credit card receipts, bank statements, and such other supporting documents or other data as the Landlord may require. Expenditures for ordinary repairs and maintenance shall not be considered Improvements; however, expenditures for Improvements reflected in **Exhibit "Y"** shall be included in the total cost in addition to architectural/engineering fees incurred by the Tenant. In making the determination of the total cost of Improvements, Landlord may request any information it reasonably believes would be helpful to make such a determination. Tenant must forward such information to Landlord upon request. Landlord reserves the right to determine whether certain repairs and material purchases can be accepted as Improvements.

B.      Tenant, at its own expense, upon the Commencement Date and from time to time during the Lease Term, may make such alterations, additions and improvements to the interior of the Premises, excluding structural changes, as Tenant may consider necessary or desirable for its business, provided that the strength of the Building is not affected. If such alterations, improvements or additions permitted to be made by Tenant are of a structural nature, they shall be made only with the prior written consent of Landlord.

C.      Tenant shall not destroy or remove trees from the Premises without the prior written consent of Landlord.

D.      Landlord has not conveyed to Tenant any rights in or to the outer side of the outside walls of the building of which the Premises form a part and Tenant shall not display or erect anything thereon or make any alterations, additions, improvements or changes to the exterior of the Premises without Landlord's prior written consent.

22

E.      Tenant agrees, at its expense, before the commencement of any such alteration,

addition or improvements to cause the plans and specifications for such work, if required, to be

filed with and approved by any and all municipal and other governmental authorities and

departments having jurisdiction thereof, and to deliver for the prior written approval of Landlord

copies of such plans and specifications.  If Landlord makes any objections to the plans and

specifications submitted by Tenant then Tenant shall cause such plans and specifications to be

revised and resubmitted to Landlord to satisfy Landlord's objections.  All of Tenant's alterations,

additions and improvements shall be completed in accordance with the final plans and

specifications approved by Landlord.  No material change shall be made to any plans or

specifications approved by Landlord without Landlord's consent and all changes to plans and

specifications and Tenant's work undertaken pursuant to same shall comply with the terms of

this Article.  Landlord's acceptance of the plans, specifications and working drawings for

Tenant's alterations shall create no responsibility or liability on the part of Landlord for their

completeness, design sufficiency or compliance with all laws, rules and regulations of

governmental agencies or authorities.

F.      Tenant agrees to do any work pursuant to this Article in compliance with all

applicable laws and ordinances, in a good and workman like manner.

G.      Tenant must not allow any liens or other charges to be filed against the Premises

or the Building.  Any mechanic's lien filed against the Premises or the Building for work done or

claimed to be done for the Tenant or materials furnished or claimed to be furnished to Tenant

shall be discharged by Tenant at its expense within twenty (20) days after notice thereof from

Landlord or otherwise, by payment, release, filing of the bond required by law, court order, or

otherwise.

23

H.       Prior to commencement of any Bondable Work, Tenant shall deliver or cause its

contractors to deliver to Landlord a payment bond in an amount equal to one hundred (100%)

percent of the aggregate costs and expenses of any Bondable Work, guaranteeing prompt

payment of monies due to all persons furnishing labor and materials for such Bondable Work.

Each bond shall be satisfactory to Landlord in form and substance in its sole discretion and shall

be issued by a surety company licensed or authorized to do business in New York State that is

approved by the Comptroller of the City of New York. If, prior to substantial completion of the

applicable Bondable Work, the payment bond is cancelled or otherwise cases to be in full force

and (other than pursuant to its terms), then, whin thirty (30) days after notice of the foregoing

Tenant shall provide aa replacement bond or other comparable security acceptable to Landlord in

its sole discretion. "Bondable Work" means any construction work the cost of which (as

determined by the total contract price for the planned construction work) is greater than

$250,000.00.

I.       Prior to beginning any construction on the Premises, Tenant shall provide, or

cause to be provided, at no cost to Landlord, the insurance coverages set forth in Article 16

hereof.

J.       All alterations, installations, additions, improvements and floor covering (except

carpets) made and installed by Tenant on or upon the Premises which are of a permanent nature,

shall, upon the expiration or earlier termination of the Lease Term, become and be the property

of Landlord and shall remain upon and be surrendered with the Premises, unless requested by

Landlord to be removed prior to the expiration or sooner termination of the Lease, except as

hereinafter provided.  Nothing in this section shall be construed to prevent Tenant's removal of

trade fixtures, but upon removal Tenant shall immediately, and at its sole cost and expense,

24

repair and restore the Premises to the condition existing prior to installation thereof and repair any damage to the Premises caused by such removal.  All property permitted to be removed by Tenant at the end of the Term including trade fixtures remaining in the Premises after Tenant's vacating shall be deemed abandoned and, at the election of Landlord, shall either be retained as Landlord's property or removed from the Premises by Landlord at Tenant's expense.  Tenant's obligations under this Paragraph shall survive the expiration or earlier termination of the Lease Term.

K.      Upon issuance of a Temporary Certificate of Occupancy for the Improvements, but no less than 30 days prior to the end of the Rent Concession Period, Tenant shall provide Landlord with invoices and supporting documentation demonstrating the capital expenditures for the alterations and improvements made to the Premises in an amount no less than $5,000,000.00, as well as proof of compliance with the Scope of Work, the Final Plans, a valid Temporary Certificate of Occupancy or Certificate of Occupancy and all applicable laws and regulations. Landlord, at its election, may inspect the Premises. Tenant agrees to perform the work pursuant to this Article in a good and workmanlike manner and in compliance with all applicable laws and ordinances. If Landlord finds any such alterations and improvements unsatisfactory to the extent that same is not in compliance with the requirements described in this Article 11, Landlord shall provide written notice to Tenant of same ("Completion Notice"), and Tenant shall, within seven (7) business days of such Completion Notice, commence to cure all conditions describes in the Completion Notice.

L. In the event Tenant fails to meet any timeframes specified in this Article 11, other than due to conditions in Article 36 of this Lease or unavoidable delays, the Rent Concession Period shall be accelerated for each day Tenant is delayed in complying with said timeframes ("Rent

Acceleration Period". The rent and additional for the Rent Acceleration Period shall accrue and become due and owning together with the first payment of rent due at the end of the Rent Concession Period.

## ARTICLE 12

## REPAIRS AND MAINTENANCE

A.      Tenant shall take good care of the Premises and maintain the same in a safe and secure manner.    To keep the Premises in good working order and condition, Tenant shall, as and when needed and at its sole cost and expense:

(i)      make all nonstructural and structural repairs to the interior of the Premises and be responsible for maintenance, security, extermination, cleaning and rubbish removal;

(ii)      make all nonstructural and structural repairs to the exterior of the Premises (including the parking surface, if applicable), unpaved area, drainage systems, perimeter fencing, sidewalks and curbs adjacent to the Premises and be responsible for keeping the same clean and free of ice, snow, trash, debris and obstruction.

B.      Tenant shall also make any repairs, structural or nonstructural, interior or exterior, made necessary by reason of the moving of Tenant's fixtures, furniture or equipment or by alterations, additions, or improvements made by Tenant or made necessary by the negligence or misconduct of Tenant, its employees or agents...

C.      Tenant is responsible for all damage due to lack of care and for normal wear and tear. If Tenant fails to make repairs within ten (10) business days (except for emergency repairs, which must be made immediately), Landlord may do so and charge Tenant the cost of such repairs as Additional Rent.  Tenant shall leave the Premises broom clean at the end of the Term.

26

Tenant shall not excavate or perform any foundation work in the Premises.

D.      (1)      All repairs, restorations and replacements by Tenant shall be in quality and class equal to the original work or installations and shall be done in a good and workmanlike manner.  If Tenant shall fail to commence the making of such repairs, restorations or replacements within ten (10) business days after written request from Landlord, or if after commencing them, shall fail to make and complete them with reasonable diligence, they may, at Landlord's option, be made by Landlord at the expense of Tenant.  Any amount due Landlord from Tenant pursuant to this Paragraph shall be paid by Tenant as Additional Rent within fifteen (15) days after receipt of a bill and statement thereof.

(2)      Tenant shall not make any exterior or structural repairs without obtaining written consent from Landlord.

E.      Failure of Tenant to make repairs pursuant to this Article shall, at Landlord's option, be deemed an event of default. Landlord shall have the right to inspect the premises periodically, upon reasonable notice to Tenant. Tenant shall be responsible, at its sole cost and expense, to cure any and all violations resulting from Tenant's default under this Article 12 within thirty (30) days of receipt of notice of same.

F.      Except as expressly provided otherwise in this Lease, there shall be no rent allowance to Tenant and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from the making of any renovations, alterations, improvements or repairs to the Premises by Landlord, nor shall Tenant be entitled to claim eviction in whole or in part. Landlord shall be responsible for any damage caused solely by Landlord's own negligence or its wrongful actus or omissions.

G.      Landlord shall not be required to furnish any services, utilities or facilities

27

whatsoever to the Premises.  Landlord shall have no duty or obligation to make any alteration, change, improvements, replacements, restorations or repairs to, or to demolish, the Building. Tenant assumes the full and sole responsibility for the condition, operation, repair, alteration, improvement, replacement, maintenance and management of the Premises.

H.      Tenant, at its own expense, may install and shall maintain its own telephone, computer, and Internet services.  Should Tenant's telephone, computer and/or Internet services cease to function or their service providers go out of business due to Force Majeure, Landlord shall have no responsibility of any kind to Tenant, including reduction of rent, for such loss of service.

I.      Tenant, at its own expense, shall maintain and test the sprinkler system, if applicable.

J.      Tenant, at its own expense, will cause all windows in the Premises to be cleaned, but will not clean, or permit any window in the Premises to be cleaned from the outside by any of its employees or contractors in violation of Section 202 of the Labor Law or of the rules of the Board of Standards and Appeals or of any other Board or body having or asserting jurisdiction.

K.      Tenant covenants and agrees that it will, throughout the term of this Lease and at its own cost and expense, repair and replace any and all damaged or broken windows, doors or other glass, together with the frames and supports thereof on the inside and outside of the Premises.  Tenant shall carry plate glass insurance in an amount sufficient to cover replacement costs and shall name the Landlord as an additional insured.

## ARTICLE 13

## IMPOSITIONS AND UTILITIES

A.    <u>Impositions</u>.

(1)    Tenant shall pay, in the manner provided in <u>Section 13(A)(3)</u> hereof, all Impositions (as defined in <u>Section 13(A)(2)</u> hereof) that at any time are, or (if the Premises or any portion thereof or the owner thereof were not exempt therefrom) would be assessed, levied, confirmed, imposed upon, or would grow out of, become due and payable out of, or with respect to (i) the Premises, the improvements or any part thereof, or (ii) any vault, passageway or space in, over or under any adjacent sidewalk or street, or (iii) any other appurtenances of the Premises, the improvements or any part thereof, or (iv) any personal property or other facility used in the operation thereof, or (v) the Annual Base Rent (or any portion thereof) payable by Tenant hereunder, or (vi) any document to which Tenant is a party creating or transferring an interest or estate in the Premises, the improvements, or any part thereof, or (vii) the use and occupancy of the Premises, the improvements or any part thereof, or (viii) this transaction.

(2)    The terms "**Imposition**" and "**Impositions**" as used herein shall collectively mean:

(i)    real property general and special assessments (including, without limitation, any special assessments for business improvement district or imposed by any special assessment district);

(ii)    personal property taxes;

29

(iii)        occupancy and rent taxes;

(iv)        license and permit fees;

(v)        service charges with respect to police protection, fire protection, street and highway construction, maintenance and lighting, sanitation and water supply;

(vi)        except for Real Estate Taxes, any other governmental levies, fees, rents, assessments or taxes (including taxes on parking revenue) and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind whatsoever; and

(vii)        any fines, penalties and other similar governmental charges applicable to the foregoing, together with any interest or costs with respect to the foregoing.

(3)        Tenant shall throughout the Term pay, or cause any subtenant to pay, each Imposition, or installment thereof, no later than either the due date thereof or the day any fine, penalty, interest or cost may be added thereof or the day any fine, penalty, interest or cost may be added thereto or imposed by law for the non-payment thereof; provided, however, that if, by law any Imposition may at the option of the payor be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Tenant may exercise the option to pay the same in such installments and shall be responsible for the payment of only such installments which shall become due and payable during the Term or the term of such subtenant's Sublease, as same is defined in Article 9, respectively.

(4)        Tenant shall furnish Landlord, within thirty (30) days after the date when an Imposition is due and payable, official receipts of the appropriate taxing authority or other proof satisfactory to Landlord, evidencing the payment thereof.

(5)        Any certificate, advice or bill of the appropriate official designated by law to make or issue the same or to receive payment of any Imposition asserting non-payment of

such Imposition shall be prima facie evidence that such Imposition is due and unpaid at the time

of the making or issuance of such certificate, advice or bill, at the time or date stated therein.

(6)     Any Imposition relating to a fiscal period of the taxing authority, a part of

which is included within the Term and a part of which is included in a period of time after the

Expiration Date of the Term, shall be apportioned pro rata between Landlord and Tenant as of

the Expiration Date, (unless the Expiration Date has occurred as a result of an event of default, in

which case Tenant shall not be entitled to an apportionment).

B.     <u>Utility Service to the Premises</u>.

(1)     Tenant must obtain and pay, or cause any subtenant to pay, all costs of

utilities (including, without limitation, installation thereof, if applicable), including all sewer

charges and charges for all water, gas, heat and electricity, consumed and used in, or with respect

to, the Premises, and Tenant, at its sole cost and expense, shall install, maintain and repair all

meters and procure all permits, approvals and licenses necessary to secure delivery and

installation of such utility services.  Tenant shall pay any utility charges directly to the

companies supplying such utility services all charges therefor, as the same shall become due.

(2)     Landlord shall have no obligation to provide any utility services to the

Premises, or any part thereof, and Landlord shall not have any responsibility or liability to

Tenant or any third party in the event any such utility services are not provided to the Premises,

or any part thereof.

## ARTICLE 14

## QUIET ENJOYMENT

Landlord covenants that Tenant, upon paying the rent reserved herein, and performing all

of the other material terms, covenants and conditions on its part to be performed, shall and may

31

peaceably and quietly have, hold and enjoy the Premises for the use and purpose stated in this

Lease, subject to the terms of this Lease specifically including Article 20.

# ARTICLE 15

## COMPLIANCE WITH LAWS; HAZARDOUS MATERIALS

A.    Tenant, at its sole cost and expense, shall remove all violations issued against

the Premises and shall comply with all present and future laws, orders, ordinances, rules and

regulations of federal, state, county and municipal authorities, including, without limitation, the

Americans With Disabilities Act of 1990, all Environmental Laws (defined below), and all

orders, rules and regulations of the New York Board of Fire Underwriters or any similar body

which shall impose any violation, order or duty upon Landlord or Tenant with respect to the

Premises arising out of Tenant's use or manner of use or occupancy thereof and with any

direction made pursuant to law by any public officer or officers with respect to the use of the

Premises, or to any abatement of nuisance or with respect to conditions which have been created

by or at the instance of Tenant or required by reason of a breach of any of Tenant's covenants or

agreements hereunder.

B.    Should Tenant move any safe, heavy machinery, heavy equipment, freight, bulky

matter or heavy fixtures on or off the Premises or in or out of the Building, Tenant shall do said

work in full compliance with the Administrative Code of the City of New York and other

municipal requirements.

C.    Except as may be agreed by the City as part of this Lease, Tenant shall not cause

or permit, or allow any of Tenant's personnel to cause or permit any Hazardous Materials to be

brought upon, stored, used generated, treated or disposed of on the Premises.  The term

32

"**Hazardous Materials**" as used herein shall mean any chemical, substance or material which is now or becomes in the future listed, defined or regulated in any manner by any Environmental Laws based upon, directly or indirectly, its properties or effects. The term "**Environmental Laws**" as used herein shall mean any and all federal, state or local environmental, health and/or safety-related laws, regulations, standards, decisions of the courts, permits or permit conditions, currently existing or as amended or adapted in the future which are or become applicable to Tenant or the Premises

## ARTICLE 16

## INSURANCE

A.     From the Effective Date through the date of its expiration or termination, Tenant shall ensure that the types of insurance indicated in this Article are obtained and remain in force, and that such insurance adheres to all requirements herein.

B.     Tenant is authorized to undertake or maintain operations under this Lease only during the effective period of all required coverage.

C.     Required Coverages.

(1)     **Commercial General Liability Insurance.**

(i)     Tenant shall maintain Commercial General Liability insurance in the amount of at least Four Million Dollars ($4,000,000.00) per occurrence. In the event such insurance contains an aggregate limit, the aggregate shall apply on a per-location basis applicable to the Premises and such per-location aggregate shall be at least Eight Million Dollars ($8,000,000.00). This insurance shall protect the insureds from claims for property damage and/or bodily injury, including death, that may arise from any of the operations under this Lease. Coverage shall be at least as broad as that provided by the

33

most recently issued Insurance Services Office ("**ISO**") Form CG 0001, shall contain no

exclusions other than as required by law or as approved by the Commissioner, and shall

be "occurrence" based rather than "claims-made." Policies providing such insurance may

not include any endorsements excluding coverage relating to the emission of asbestos,

lead, mold, or pollutants.

(ii) Such Commercial General Liability insurance shall name the City,

together with its officials and employees, as an Additional Insured with coverage at least

as broad as the most recent edition of ISO Form CG 2026.

(2) **Workers' Compensation, Employers Liability, and Disability Benefits
Insurance.**

(i) Tenant shall maintain Workers' Compensation insurance,

Employers Liability insurance, and Disability Benefits insurance on behalf of, or with

regard to, all employees involved in Tenant's operations under this Lease, and such

insurance shall comply with the laws of the State of New York.

(3) **Commercial Automobile Liability Insurance.**

(i) If Tenant uses automobiles in its operations under this Lease,

Tenant shall maintain or cause to be maintained Commercial Automobile Liability

insurance in the amount of at least One Million Dollars ($1,000,000.00) each accident

combined single limit for liability arising out of ownership, maintenance or use of any

owned, non owned or hired vehicles. Coverage shall be at least as broad as the latest

edition of ISO Form CA0001.

(ii)    If vehicles are used for transporting hazardous materials, such Commercial Automobile Liability insurance shall be endorsed to provide pollution liability broadened coverage for covered vehicles (endorsement CA 99 48) as well as proof of MCS-90.

(4)    **Property Insurance.**

(i)    Tenant shall maintain comprehensive "All Risk" or "Special Perils" form property insurance covering all buildings, structures, equipment and fixtures that the City owns, or in which the City has an interest, that are either leased under this Lease or used in connection with operations under this Lease (collectively, the "**City's Property Interests**").  Such insurance shall provide the cost of fully replacing and/or restoring the Premises ("**Full Replacement Cost**") coverage for the City's Property Interests (without depreciation or obsolescence clause) and include, without limitation, coverage for loss or damage by acts of terrorism, water, flood, subsidence and earthquake.

(ii)    Prior to the commencement of the term of this Lease, Full Replacement Cost shall be fixed by Landlord ("Landlord's Determination"). Once every three (3) years thereafter, an engineer, appraiser or other representative of Landlord shall inspect and examine the Property and determine the Full Replacement Cost of the buildings, structures and improvements to be covered by insurance. The amount so ascertained, which shall be fair and reasonable, shall be certified to Landlord. Upon such certification, Landlord shall notify Tenant in writing of the amount so certified.  Within seven (7) days after receipt of such notices (if the amount of outstanding insurance is

35

greater or less than the amount so certified), Tenant shall increase or decrease the said insurance so as to make it equal to and conform with the amount so certified.

(iii)     Tenant shall notify Landlord ("Tenant's Determination) within twenty (20) days after Tenant's receipt of Landlord's Determination whether Tenant accepts or disputes Landlord's Determination, and if Tenant disputes Landlord's Determination, Tenant's Determination shall set forth Tenant's determination of the Full Replacement Cost and shall be accompanied by supporting documentation. Landlord and Tenant shall, in good faith, attempt to arrive at an agreement as to the Full Replacement Cost, as soon as possible. If the Full Replacement Cost has not been agreed to within thirty (30) days of receipt of Tenant's Determination, Tenant and Landlord shall select a mutually acceptable independent appraiser ("Appraiser") to determine the Full Replacement Cost ("Appraiser's Determination".)

(iv)     (a) If the Appraiser's Determination is greater than both the Landlord's Determination and the Tenant's Determination, then the Full Replacement Cost shall be the Landlord's Determination; (b) if the Appraiser's Determination is lower than both the Landlord's Determination and the Tenant's Determination, then the Full Replacement Cost shall be the Tenant's Determination; or (c) if the Appraiser's Determination is between the Landlord's Determination and the Tenant's Determinations, then the Full Replacement Cost shall be calculated as the average of (x) the Appraiser's Determination and (y) whichever of the Landlord's Determination and Tenant's Determination is closer to the Appraiser's Determination.

(v)        Such insurance shall be on an "occurrence" (rather than "claims-made") basis and shall designate Tenant as Named Insured and the City as Loss Payee as their interests may appear.

(vi)       The limit of such property insurance shall be no less than the full costs of replacing the City's Property Interests including, without limitation, the costs of post-casualty debris removal and soft costs, to the extent that such costs can be covered by an "all risk" or "special perils form" insurance policy.  If such insurance contains an aggregate limit, it shall apply separately to the City's Property Interests.

(vii)      In the event of any loss to the City's Property Interests, Tenant shall provide the insurance company that issued such property insurance with prompt, complete and timely notice, and simultaneously provide the Commissioner with a copy of such notice. Tenant shall thereafter do all acts that are necessary, in a timely manner, to adjust such claim on terms that provide the City with the maximum possible payment for the loss. Tenant shall also either provide the City with the opportunity to participate in any negotiations with the insurer regarding adjustments for claims or, at the Commissioner's discretion, allow the City itself to adjust such claim.

(5)        **Pollution Legal Liability Insurance.**

(i)        Tenant shall maintain Pollution Legal Liability Insurance covering bodily injury, property damage, clean-up costs/remediation expenses and legal defense costs for new pollution conditions both on and off-site.  If Tenant's operations include loading, unloading or transportation of any waste or hazardous materials to or from the

37

Premises, this insurance shall expressly include such activities and any non-owned facilities/sites utilized for the disposal of wastes or hazardous materials transported from the Premises.  If the Premises contains any underground storage tank(s), this insurance shall expressly include such tanks.

(ii)      This insurance shall have a limit of at least Two Million Dollars ($2,000,000.00) and provide coverage for Tenant as Named Insured and the City, together with its officials and employees, as Additional Insured.  Coverage for the City shall be at least as broad as if such coverage is written on a claims-made basis, Tenant's insurance shall have a retroactive date on or before the effective date of this Lease, and continuous coverage shall be maintained, or an extended discovery period exercised, for a period of not less than three years after the expiration or termination of this Lease.

(6)      **Contractors Pollution Liability Insurance.**

(i)      In the event Tenant enters into a contract with another that involves abatement, removal, repair, replacement, enclosure, encapsulation and/or delivery, receipt, or disposal of any petroleum products, asbestos, lead, PCBs or any other hazardous materials or substances, Tenant shall maintain, or cause the contractor to maintain, Contractors Pollution Liability Insurance covering bodily injury, property damage, clean-up costs/remediation expenses and legal defense costs.  Such insurance shall provide coverage for sudden and non-sudden pollution conditions arising out of the contractor's operations at the Premises.

(ii)     If required, the Contractors Pollution Liability Insurance shall each have a limit of at least Two Million Dollars ($2,000,000.00) and provide coverage for Tenant as Named Insured or Additional Insured and the City, together with its officials and employees, as Additional Insured.  Coverage for the City shall be at least as broad as Tenant's.  If this insurance is issued on a claims-made basis, such policy or policies shall have a retroactive date on or before the beginning of the contractor's work, and continuous coverage shall be maintained, or an extended discovery period exercised, for a period of not less than three years after the termination of such work.

D.     <u>General Requirements for Insurance Coverage and Policies</u>

(1)     Policies of insurance required under this Article shall be provided by companies that may lawfully issue such policy and have an A.M. Best rating of at least A- / "VII" or a Standard and Poor's rating of at least A, unless prior written approval is obtained from the Commissioner.

(2)     Policies of insurance required under this Article shall be primary and non-contributing to any insurance or self-insurance maintained by the City.

(3)     There shall be no self-insurance program with regard to any insurance required under this Article unless approved in writing by Landlord.  Tenant shall ensure that any such self-insurance program provides the City with all rights that would be provided by traditional insurance under this Article, including but not limited the defense and indemnification obligations that insurers are required to undertake in liability policies.

(4)     The City's limits of coverage for all types of insurance required under this Article shall be the greater of (x) the minimum limits set forth in this Article or (y) the limits

39

provided to Tenant under all primary, excess and umbrella policies covering operations under this Lease.

(5)    Tenant shall provide the City with advance written notice in the event such policy is to expire or be cancelled or terminated for any reason, and to mail such notice to both Landlord at the Municipal Building, One Centre Street, 20th Floor North, New York, New York 10007, and the New York City Comptroller, Attn: Office of Contract Administration, Municipal Building, One Centre Street, Room 1005, New York, New York 10007. Such notice is to be sent at least thirty (30) days before the expiration, cancellation or termination date, except in cases of non-payment, where at least ten (10) days written notice must be provided.

(6)    All required policies, except Workers' Compensation, Employers Liability, Disability Benefits, and United States Longshoremen's and Harbor Workers Act and/or the Jones Act insurance, shall include a waiver of the right of subrogation with respect to all insureds and loss payees named therein.

E.  Proof of Insurance

(1)    Certificates of Insurance, "Additional Insured" endorsements and Certification of Insurance Broker or Agent for all insurance required in this Article must be submitted to and accepted by Landlord prior to or upon execution of this Lease.

(2)    For Workers' Compensation, Employers Liability Insurance, and Disability Benefits insurance policies, Tenant shall submit one of the following:

(i)    C-105.2 - Certificate of Worker's Compensation Insurance;

(ii)    U-26.3 - State Insurance Fund Certificate of Workers' Compensation Insurance;

40

(iii)    Request for WC/DB Exemption (Form CE-200);

(iv)    Equivalent or successor forms used by the New York State Workers' Compensation Board;

(v)    Other proof of insurance in a form acceptable to the City.  ACORD forms  are not acceptable proof of workers' compensation coverage.

(3)    For all insurance required under this Article other than Workers Compensation, Employers Liability, Disability Benefits and United States Longshoremen's and Harbor Workers Act and/or the Jones Act insurance, Tenant shall submit one or more Certificates of Insurance and certified copies for all policies in a form acceptable to Landlord. All such Certificates of Insurance shall (a) certify the issuance and effectiveness of all such policies of insurance, each with the specified minimum limits; and (b) be accompanied by the provision(s) or endorsement(s) in Tenant's policy/ies (including its general liability policy) by which the City has been made an additional insured or loss payee, as required herein.  All such Certificates of Insurance shall be accompanied by a duly executed "Certification by Broker" in the form required by Landlord and certified copies of all policies referenced in such Certificate of Insurance.  If any policy is not available at the time of submission, certified binders may be submitted until such time as the policy is available, at which time a certified copy of the policy shall be submitted.

(4)    Certificates of Insurance confirming renewals of insurance together with certified copies of policies shall be submitted to Landlord prior to the expiration date of coverage of all policies required under this Lease.  Such Certificates of Insurance shall comply with Section 16(E)(2) and Section 16(E)(3) directly above.

41

(5)     Acceptance or approval by Landlord of a Certificate of Insurance, policy, or any other matter does not waive Tenant's obligation to ensure that insurance fully consistent with the requirements of this Article is secured and maintained, nor does it waive Lessee's liability for its failure to do so.

(6)     Tenant shall be obligated to provide the City with an additional copy of any policy of insurance required under this Article upon request by the Commissioner or the New York City Law Department.

F.     Miscellaneous

(1)     In the event Tenant enters into a sublease under this Lease, Tenant shall require any such sublessee to obtain all insurance required of Tenant under this Article.  Tenant shall ensure that each sublessee name the City as Additional Insured or Loss Payee, as appropriate, under all policies obtained by such sublessee covering operations by such sublessee under this Lease.  The City's coverage as Additional Insured shall include the City's officials and employees and be at least as broad as that provided to Tenant.

(2)     Tenant may satisfy its insurance obligations under this Article through primary policies or a combination of primary and excess/umbrella policies, so long as all policies provide the scope of coverage required herein.

(3)     Tenant shall be solely responsible for the payment of all premiums for all policies and all deductibles or self-insured retentions to which they are subject, whether or not the City is an insured under the policy.

(4)     Where notice of loss, damage, occurrence, accident, claim or suit is required under a policy maintained in accordance with this Article, Tenant shall notify in writing

42

all insurance carriers that issued potentially responsive policies of any such event relating to any operations under this Lease (including notice to Commercial General Liability insurance carriers for events relating to Tenant's own employees) no later than twenty (20) days after such event. For any policy where the City is an additional insured, such notice shall expressly specify that "this notice is being given on behalf of the City of New York as Insured as well as the Named Insured." Such notice shall also contain the following information: the number of the insurance policy, the name of the named insured, the date and location of the damage, occurrence, or accident, and the identity of the persons or things injured, damaged or lost. Tenant shall simultaneously send a copy of such notice to the City of New York c/o Insurance Claims Specialist, Affirmative Litigation Division, New York City Law Department, 100 Church Street, New York, New York 10007.

(5)     Tenant's failure to secure and maintain insurance in complete conformity with this Article, or to give the insurance carrier timely notice on behalf of the City, or to do anything else required by this Article shall constitute a material breach of this Lease. Such breach shall not be waived or otherwise excused by any action or inaction by the City at any time.

(6)     Insurance coverage in the minimum amounts provided for in this Article shall not relieve Tenant or subtenants of any liability under this Lease, nor shall it preclude the City from exercising any rights or taking such other actions as are available to it under any other provisions of this Lease or the law.

(7)     In the event of any loss, accident, claim, action, or other event that does or can give rise to a claim under any insurance policy required under this Article, Tenant shall at all times fully cooperate with the City with regard to such potential or actual claim.

43

(8)     Tenant waives all rights against the City, including its officials and employees, for any damages or losses that are covered under any insurance required under this Article (whether or not such insurance is actually procured or claims are paid thereunder) or any other insurance applicable to the operations of Tenant and/or its employees, agents, or servants of its contractors or subcontractors.

(9)     In the event Tenant receives notice, from an insurance company or other person, that any insurance policy required under this Article shall expire or be cancelled or terminated (or has expired or been cancelled or terminated) for any reason, Tenant shall immediately forward a copy of such notice to both the Landlord and the New York City Comptroller at the addresses provided above.  Notwithstanding the foregoing, Tenant shall ensure that there is no interruption in any of the insurance coverage required under this Article.

## ARTICLE 17

## INDEMNIFICATION

A.     To the fullest extent permitted by law, Tenant shall indemnify, defend and hold the City and its officials and employees (collectively, the "**Indemnitees**") harmless against any and all claims, charges, liens, demands, obligations, judgments, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature (including, without limitation, reasonable architects, engineers and attorneys' fees and disbursements) which may be imposed upon or incurred by or asserted against Landlord by reason of any of the following during the Term of this Lease:

(1)     any construction, work or thing done in, on or about the Premises or any part thereof by Tenant, its agents, contractors, servants, employees, subtenants, licensees, franchisees or invitees;

44

(2)      any use, non-use, possession, occupation, condition, operation,

maintenance or management by Tenant, its agents, contractors, servants, employees, subtenants,

licensees, franchisees or invitees, of the Premises or any part thereof or any street, alley,

sidewalk, curb, vault, passageway, or space adjacent thereto (other than to the extent caused by

the negligence or intentional tort of any Indemnities);

(3)      any negligence or conduct on the part of Tenant or any of its agents,

contractors, servants, employees, subtenants, licensees, franchisees or invitees;

(4)      any accident, injury (including death) or damage to any person or property

occurring in, on or about the Premises or any part thereof or any street, alley, sidewalk, curb,

vault, loading dock or area, passageway or space or lands under water adjacent there (other than

to the extent caused by the negligence or intentional tort of any Indemnities); or

(5)      any breach by Tenant, Tenant's agents, contractors, servants, employees,

licensees, franchisees or invitees of any of the covenants, agreements, terms or conditions

contained in this Lease on its part to be performed or complied with.

B.      Insofar as the facts or law relating to any of the foregoing would preclude the City

or its officials and employees from being completely indemnified by Tenant, the City and its

officials and employees shall be partially indemnified by Tenant to the fullest extent permitted

by law.

C.      Tenant's obligation to defend, indemnify and hold the City and its officers and

employees harmless shall not be (i) limited in any way by Tenant's obligations to obtain and

45

maintain insurance under this Lease, nor (ii) adversely affected by any failure on the part of the City or its officers and employees to avail themselves of the benefits of such insurance.

D.      In the event Tenant is obligated to defend Landlord pursuant to this Article, such defense will be provided at Tenant's sole cost and expense by counsel reasonably approved by Landlord.

## ARTICLE 18

## DAMAGE OR DESTRUCTION

A.      If the Premises are damaged or destroyed, Tenant shall promptly notify Landlord of such fact and shall immediately take all necessary measures for the safety and preservation of the Premises.  In the event Tenant fails to take such measures, Landlord may do so at Tenant's expense.

B.      Tenant's obligation to pay the Base Rent and all Additional Rent on the part of Tenant to be paid and to perform all other covenants and agreements on the part of Tenant to be performed shall not be abated or affected by any such damage to or destruction of the Premises by fire or otherwise, except as specifically provided in this Article, and Tenant hereby waives the provisions of any statute or law now or hereafter in effect contrary to such obligations of Tenant as herein set forth or which relieve Tenant therefrom.  Tenant agrees that this is an "express agreement to the contrary" pursuant to Section 227 of the New York Real Property Law and shall govern in lieu thereof.

C.      Should the damages to the Premises be such that the Premises can reasonably be repaired or restored within one hundred eighty (180) days from the date of such destruction, then Tenant, at its sole cost and expense, shall proceed promptly and with due diligence to restore the Premises to the same condition as prior to such damage or destruction.  During this one hundred

46

eighty (180) day period, Base Rent shall abate during any period when the restoration work is impossible to perform due to strikes, work stoppages, material shortages, natural disasters or other factors beyond the reasonable control of the Tenant.

D.     If Landlord and Tenant do not elect not to terminate this Lease as provided herein below, the insurance shall be paid to and deposited in a bank or trust company in the City of New York, approved by Landlord and Tenant, and hereinafter called the "**depository**", and shall be applied toward the cost of repair, rebuilding and restoration of the damaged Premises in the manner hereinafter provided. The fees of the depository for acting as such shall be paid by it to itself out of the insurance proceeds deposited with it as aforesaid, but such fees shall not exceed one percent (1%) of the amount deposited with the depository. The depository shall make progress payments to Tenant as the work of repair, restoration and rebuilding proceeds, upon receipt by it of properly certified vouchers of the architect in charge of the work and reasonably acceptable to Landlord. Each such requisition shall be made not more often than semi-monthly, to cover the value of the work and materials on the site during the preceding half-month or month, as the case may be, covered by such requisition, less ten percent (10%) of each requisition, which shall be retained by the depository until the completion of the repair, restoration and rebuilding, and shall thereupon be paid to Tenant. Upon full completion of the repair, restoration and rebuilding, Tenant shall furnish such reasonable proof as the depository shall require to demonstrate that payment has been made to pay for all work, labor and materials furnished for such repair, restoration and rebuilding and that there are no liens of record on account thereof.

E.     Should the Premises be damaged to such an extent that the Premises (a) cannot reasonably be repaired within one hundred eighty (180) days from the date of such damage or

47

destruction or (b) the insurance proceeds together with the total amount abated Rent are insufficient to complete the work , then Landlord or Tenant, within thirty (30) days of such damage or destruction may, at its option, terminate this Lease upon written notice to the other party.

Tenant shall immediately after such destruction or damage take all necessary measures for the safety and preservation of the Premises, and in default of Tenant taking such measures, Landlord may do so at Tenant's expense.  If Landlord and Tenant do not elect to terminate this Lease as above provided, Tenant shall repair and reconstruct the Premises.  Such work shall be promptly commenced and diligently carried through to completion.  If the insurance proceeds are insufficient for the completion of the work, Tenant will pay, without reimbursement from Landlord, the difference between the insurance proceeds and the amount required to complete the work.  Provided Tenant promptly commences and diligently carries through to completion such repair and reconstruction work, the Base Rent shall be proportionate to that part of the Premises that remains useable (i.e., the Base Rent for the unusable portion shall abate) during the period of time of such damage or destruction and subsequent repair and reconstruction. Landlord shall not be required to rebuild, rehabilitate or replace such destruction or damage and shall not be responsible in any manner for such reconstruction.  Notice of intent to terminate or repair shall be given to the other party hereto within thirty (30) days of the date of such damage or destruction.

F.      If the damage or destruction is such that repair or replacement cannot reasonably be concluded within the then remaining Term, then either party at its option may terminate this Lease upon thirty (30) days' notice to the other.

G.      In the event the Lease is terminated pursuant to this Article, the entire insurance

48

proceeds shall be and remain the outright property of Landlord and Tenant shall take all necessary measures to assign and cause the insurance company to remit all such proceeds to Landlord.

H.      Tenant shall not be entitled to any portion of the insurance proceeds as compensation for its leasehold interest.

I.      If any damage or destruction to the Premises by fire or other casualty is caused by the intentional actions of Tenant, its servants, agents, licensees, franchisee, sublesees, invitees, employees or representatives, the Tenant may not terminate this Lease and shall continue to be liable for the full payment of Base Rent and Additional Rent and shall comply with all of the other terms, covenants and conditions of this Lease.

## ARTICLE 19

## CONDEMNATION

A.      If the entire Premises or a material portion for the conduct of Tenant's business thereof shall be condemned, taken or acquired by Landlord or by a body having a superior power of eminent domain, then this Lease shall terminate and come to an end immediately upon vesting of title in such condemner and Tenant shall not be entitled to any compensation by reason of termination of this Lease or of Tenant's leasehold interest.

B.      If less than a material portion of the Premises for the conduct of Tenant's business is condemned, taken or acquired, this Lease shall continue, but Annual Base Rent shall abate in proportion to the square footage on the Premises taken by the condemner, as determined by Landlord in its sole discretion.  In such event, Tenant shall not be entitled to any compensation by reason of such partial taking.

49

C.    Landlord shall be entitled to receive the entire award for the taking of the Premises or any part thereof in any condemnation proceeding, without deduction therefrom for any estate vested in Tenant by this Lease, and Tenant shall receive no part of such award or awards. Tenant hereby expressly assigns to Landlord any and all of its right, title and interest in or to such award or awards or any part thereof.

D.    Nothing contained in this Article shall be deemed to deprive Tenant of its right to claim, prove, receive and retain any award for the value of Tenant's furniture, furnishings, trade fixtures and other installations and equipment installed in the Premises by Tenant at its expense which are removable by Tenant under the provisions of this Lease, or for moving expenses and any other consequential damages to which Tenant may be entitled in such condemnation proceedings provided and to the extent that such award or awards to Tenant are not deducted from and do not in any way operate to reduce the award payable to Landlord for the taking of the land and Building.

## ARTICLE 20

### ENTRY

A.    After the commencement of the Term, Landlord, at its sole expense, may erect, use and maintain pipes and conduits in and through the Premises provided Landlord will make commercially reasonable efforts not to interfere with Tenant's use and enjoyment of the Premises.

B.    Landlord shall have the right to enter the Premises at any time to make such emergency repairs as in Landlord's opinion are necessary. Landlord shall be allowed to take all material into and upon the Premises that may be required for such repairs or alterations without

50

the same constituting an eviction of Tenant in whole or in part, and the rent reserved shall in no wise abate except as otherwise provided in this Lease while such repairs or alterations are being made, by reason of loss, inconvenience, or interruption of the operations of Tenant.

C.    During business hours, upon forty-eight (48) hours' prior notice to Tenant, Landlord shall also have the right to enter the Premises for the purpose of inspecting them or exhibiting them to prospective purchasers or tenants of the Premises, provided that Landlord shall make commercially reasonable efforts so as to not interfere with the operations of Tenant.

D.    Except as otherwise expressly provided in this Lease, neither the right and authority hereby reserved, nor the exercise thereof, shall impose, nor does Landlord assume by reason thereof, any responsibility or liability for the care or supervision of the Premises; nor shall such right of access be considered as exercising control of the Premises; nor shall same obligate Landlord to make repairs or improvements not otherwise required under this Lease.

E.    Landlord may enter Premises at reasonable times with reasonable notice to Tenant and Tenant must give Landlord keys to all locks necessary for ingress and egress to the Premises.

## ARTICLE 21

## DEFAULTS

If Tenant shall default in fulfilling any of its obligations hereunder or if the Premises become vacant or abandoned, then Landlord shall serve a written notice upon Tenant, specifying the nature of the default. If such failure or default is not cured within thirty (30) days with respect to non-monetary defaults and within (10) days with respect to monetary defaults after Landlord's written notice to Tenant, then Landlord may serve a written seven (7) day notice of termination of this Lease upon Tenant. Upon the date specified in said notice, this Lease shall

automatically terminate as if such date were the Expiration Date.  If such non-monetary default is

of such a nature that it cannot, in Landlord's sole and absolute determination, with due diligence

be cured within thirty (30) days, then Tenant shall immediately commence the curing of such

default and proceed with due diligence and shall provide Landlord with weekly written status

reports indicating the progress of curing such default.  Tenant's failure to provide the aforesaid

weekly written status reports shall be deemed an event of default hereunder which must be cured

within seven (7) days after written notice to Tenant.

## ARTICLE 22

## BANKRUPTCY; ADDITIONAL DEFAULT PROVISIONS

A.      To the extent permitted by applicable law, this Lease and the Term and estate

hereby granted are subject to the limitation that whenever Tenant shall make an assignment of

the property of Tenant for the benefit of creditors or shall file a voluntary petition under any

bankruptcy or insolvency law, or an involuntary petition alleging an act of bankruptcy or

insolvency shall be filed against Tenant under any bankruptcy or insolvency law, or whenever a

petition shall be filed against Tenant under the reorganization provisions of the United States

Bankruptcy Code (hereinafter "**the Code**") or under the provisions of any law of like import, or

whenever a petition shall be filed by Tenant pursuant to the provisions of the Code or under the

provisions of any law of like import, or whenever a permanent receiver of Tenant of or for the

property of Tenant shall be appointed, then such shall be considered a default under Article 21

and Landlord, (a) at any time after receipt of notice of the occurrence of any such event, or (b) if

such event occurs without the acquiescence of Tenant, at any time after the event continues for

one hundred twenty (120) days, may give Tenant a notice of intention to end the Term of this

Lease at the expiration of five (5) days from the date of service of such notice of intention, and

upon the expiration of said five (5) day period this Lease and the Term and estate hereby granted,

whether or not the Term shall theretofore have commenced, shall terminate with the same effect

as if that day were the Expiration Date, but Tenant shall remain liable for damages as provided in

Article 23 hereinafter.

B.      If this Lease shall be assumed or assigned by a trustee pursuant to the provisions

of the Code, the trustee shall cure any defaults under this Lease and shall provide such adequate

assurance of future performance of this Lease as is provided in Section 365(b)(3) of the Code,

including, without limitation, adequate assurance ("**Adequate Assurances**") (i) of the source of

the Base Rent and Additional Rent; (ii) that there shall be no substantive breach in the provisions

of this Lease; and (iii) that the use of the Premises shall in no way impose any additional burden

on the Building systems or increase the services to be provided by Landlord.

C.      If the trustee does not cure said defaults and provide Adequate Assurances within

sixty (60) days after there has been an order for relief pursuant to the Code, this Lease shall be

deemed rejected and Landlord shall have no further liability hereunder to Tenant or to any

person claiming through or under Tenant, and if Tenant or any such person is in possession,

Tenant or any such person shall forthwith quit and surrender the Premises to Landlord. If this

Lease shall be so cancelled or terminated, Landlord, in addition to the other rights and remedies

of Landlord under any provision of this Lease or under any statute or rule of law, may retain as

liquidated damages any security deposit, Base Rent, Additional Rent or moneys received by

Landlord from Tenant or others on behalf of Tenant.

D.      If, at any time, Tenant shall be comprised of two or more persons or Tenant's

obligations under this Lease shall have been guaranteed by any person, the word "Tenant" as

53

used in this Article shall mean any one or more of the persons primarily or secondarily liable for Tenant's obligations under this Lease.

## ARTICLE 23

## REMEDIES OF LANDLORD

A.     In case of any default and termination of this Lease or in case of Landlord's recovery of possession of the Premises, all monies owed hereunder shall immediately become due and payable to the time of such termination, together with such expenses as Landlord may incur for legal expenses, repairs or renovations.  All obligations of Tenant under this Lease shall survive such termination.  Landlord shall have no obligation to re-let the Premises.  However, Landlord may, at any time, and from time to time, re-let the Premises or any part thereof, and receive and collect the rents hereof, and may apply the same first to the payment of such costs and expenses as the Landlord may have incurred in recovering possession of the Premises, including legal expenses, and for putting the same in good order or condition or preparing or altering the same for re-rental and expenses, commissions and charges paid, assumed or incurred by the Landlord in and about re-letting thereof, and then to the fulfillment of the covenants of the Tenant hereunder.  Any such re-letting herein provided for may be for the remainder of the term of this Lease or for a longer or shorter period.  In any such case and whether or not the Premises or any part thereof be re-let, Tenant shall pay to Landlord all Base Rent, Additional Rent and other sums required to be paid by the Tenant hereunder up to the time of such termination of this Lease, or of such recovery of possession of the Premises by the Landlord, as the case may be. Thereafter, Tenant shall, if required by Landlord, pay to the Landlord until the end of the Term (notwithstanding such earlier termination or recovery of possession) the equivalent of the amount

54

of all Base Rent, Additional Rent and all other sums required to be paid by the Tenant hereunder, less the net proceeds of re-letting, if any. This deficiency amount shall be due and payable on the first day of each calendar month. At its sole option Landlord shall have the election in place and instead of holding the Tenant so liable Landlord may immediately upon default and termination or recovery of possession recover against the Tenant, as damages for loss of the bargain and not as a penalty, an aggregate sum which, at the time of such termination of this Lease, or of such recovery of possession of the Premises by the Landlord, represents the then present worth of the excess, if any, of the aggregate of all Base Rent, Additional Rent, and other sums required to be paid by the Tenant hereunder that would have accrued for the balance of the term of the Lease over the aggregate of rental value of the Premises for the balance of such term.

B.     Landlord may offset the security deposit under Article 8 herein against any payments due under this Article. Any amounts due hereunder shall be payable at the legal rate of interest.

# ARTICLE 24

## ATTORNEY'S FEES

To the extent permitted by law, Tenant shall pay to Landlord reasonable attorney's fees and any other monies paid by Landlord for service of process, marshal's fees and costs incurred in a judicial proceedings in an action to recover Rent, Additional Rent, and/or recover possession of the Premises.

# ARTICLE 25

55

## OTHER FEES AND EXPENSES

If Tenant defaults in the observance or performance of any of its terms or covenants within the time permitted, then Landlord may (but is not obligated to) immediately or at any time thereafter and without notice in emergencies, and upon ten (10) days' prior written notice in other instances, perform the same for the account of Tenant. Any expenditures or obligations for the payment of money made in connection herewith, including attorney's fees, shall be deemed to be Additional Rent and shall be paid by Tenant to Landlord within five (5) days of Landlord's rendering of any bill or statement to Tenant therefor. Any late payment shall be payable in accordance with the terms of Article 7.


## ARTICLE 26

## NO WAIVER

The failure by Landlord to insist, in one or more instances, upon the full performance of any of Tenant's covenants, conditions or obligations hereunder shall not be construed as a waiver of a subsequent breach of the same or any other covenant or condition, and the consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be construed to waive or render unnecessary Landlord's consent or approval to or of any subsequent similar act by Tenant. The receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver be in writing signed by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Base Rent or the Additional Rent herein provided for shall be deemed to be other than on account of the earliest stipulated Base Rent or Additional Rent, nor shall any endorsement or

56

statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or Additional Rent or pursue any other remedy provided in this Lease.

## ARTICLE 27

## LANDLORD'S REMEDIES CUMULATIVE

It is understood and agreed that the remedies herein given to Landlord shall be cumulative and the exercise of any one remedy by Landlord shall not be to the exclusion of any other remedy or a waiver of any its rights under the Lease.

## ARTICLE 28

## SURRENDER

Tenant covenants, on the last day of the Term of this Lease, or upon any sooner termination of the Term provided herein, peaceably and quietly to surrender and yield up to Landlord the entire Premises including all improvements thereon, except as otherwise expressly provided in this Lease.  The Premises is to be in good order and condition, reasonable wear and tear excepted and free from any Hazardous Materials.  Tenant shall nevertheless repair any damage or injury to the Premises, its fixtures, appurtenances or equipment caused by Tenant moving its property out of the Premises or by the removal of its trade fixtures, removable partitions, furniture or equipment.  Landlord, upon reasonable notice to Tenant, may then inspect Premises to confirm that it has been satisfactorily maintained, reasonable wear and tear excepted. In the event that Tenant is required to make repairs in order to surrender the Premises in good

order and condition, reasonable wear and tear excepted, Tenant shall have thirty (30) days to affect such repair to the satisfaction of Landlord, time being of the essence. Thereafter, Landlord may complete restoration of the Premises, to the condition that the Premises were in on the Commencement Date, reasonable wear and tear excepted, and assess Tenant any cost it thereby incurs that exceeds the existing balance of the security deposit, which Tenant shall pay promptly upon written demand by Landlord. Tenant's obligations under this Article shall survive the expiration or earlier termination of the term of this Lease.

## ARTICLE 29

### DAMAGES FOR FAILURE TO SURRENDER POSSESSION

A.      If Tenant fails to surrender possession of the Premises upon the last day of the Term or upon sooner termination, Tenant shall be liable for any and all damages, including damages which are consequential, incidental, special and otherwise, and including reasonable attorney's fees for any proceedings resulting therefrom, and Landlord may offset the security deposit under Article 8 herein against such damages, which damages shall in no event be limited to the security deposit.

B.      Tenant shall pay for use and occupancy for the Premises during the period it remains in possession after expiration or sooner termination of this Lease at one of the rates set forth in Section 6(G). Tenant shall pay the use and occupancy on the first day of each month during the period Tenant remains in possession. The acceptance of any payment shall not prejudice Landlord in any action to regain possession. While Tenant remains in possession, all of the other terms and conditions of the Lease shall remain in full force and effect and Tenant's obligations hereunder shall survive termination of the Lease.

58

## ARTICLE 30

## VAULTS

No vault, vault space or space not within the Premises is leased hereunder, anything contained in or indicated on any sketch, blueprint or plan, or anything contained elsewhere in this Lease to the contrary notwithstanding. Landlord makes no representation as to the location of property line of the Premises. Any vault and vault space and all space not within the property line of the Premises, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if such license be revoked, or if the amount of such space be diminished or required by any federal, state, municipal authority or public utility, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual, total or partial, eviction.

## ARTICLE 31

## JURY WAIVER AND COUNTERCLAIMS

A.    It is mutually agreed by and between Landlord and Tenant that, to the extent permitted by law, the respective parties hereto shall and hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, and Tenant's use or occupancy of the Premises.

B.      Tenant waives the right to counterclaim in any proceeding to recover Rent, Additional Rent, and/or to recover possession of the Premises.

## ARTICLE 32

## ESTOPPEL CERTIFICATES

Tenant agrees at any time and from time to time during the term of this Lease, upon not less than fifteen (15) days' prior written request by Landlord, to execute, acknowledge and deliver to Landlord a certificate in writing, certifying to the following: that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect, as modified, and stating the modifications); the dates to which the annual fixed rent and other charges have been paid in advance, if any; the amount of monthly fixed rental then payable by Tenant; and whether or not there is any existing default by Landlord of which Tenant has actual knowledge under the terms of this Lease, or notice of default served by Tenant.  If any such certification by Tenant shall allege nonperformance by Landlord, the nature and extent of such nonperformance shall, insofar as actually known by Tenant, be summarized therein.

## ARTICLE 33

## NOTICES

A.      Except as otherwise provided in this Lease, a notice or communication which either party is required to give to the other shall be in writing by personal delivery, overnight mail or registered or certified mail, return receipt requested, addressed to the other at the address below set forth or to such other address as either party may from time to time direct by written

notice given in the manner herein prescribed.  Such notice or communication shall be deemed to

be received as follows: if by personal delivery, upon receipt; if by overnight mail, the next day

following the date of mailing; or if by registered or certified mail, the third day following such

mailing.

      To Landlord:

                NYC Department of Citywide Administrative Services
                Real Estate Services
                1 Centre Street, 20th Floor
                New York, New York 10007
                Attn:  Executive Director, Planning & Dispositions

      With a Copy To:
                NYC Department of Citywide Administrative Services
                Office of General Counsel
                1 Centre Street, 19th Floor
                New York, New York 10007
                Attn:  Deputy General Counsel – Real Estate

      To Tenant:

                BROADWAY EAST GROUP, LLC
                1120 Old Country Road, Suite 203
                Plainview, New York 11803

      With a Copy To:

                Arthur J. Soong, Esq.
                Soong & Liu, Esqs.
                305 Broadway, Suite 1201
                New York, NY 10007

Tenant has the obligation to update Landlord as to all changes to the address where it wants to

receive notice under the Lease.

## ARTICLE 34

## NO DISCRIMINATION

A.   With respect to services provided under this Lease, Tenant shall not unlawfully discriminate against any customer because of actual or perceived age, religion, creed, sex, gender, gender identity or gender expression, sexual orientation, partnership status, marital status, disability, presence of a service animal, race, color, national origin, alienage, citizenship status, military status, or any other class of individuals protected from discrimination in public accommodations by City, State or Federal laws, rules or regulations.  The Tenant shall comply with all statutory and regulatory obligations to provide reasonable accommodations to individuals with disabilities.

B.   To the extent required by law, Tenant shall not unlawfully discriminate against any employee or applicant for employment because of actual or perceived age, religion, religious practice, creed, sex, gender, gender identity or gender expression, sexual orientation, status as a victim of domestic violence, stalking and sex offenses, familial status, partnership status, marital status, caregiver status, pregnancy, childbirth or related medical condition, disability, presence of a service animal, predisposing genetic characteristics, race, color, national origin (including ancestry), alienage, citizenship status, political activities or recreational activities as defined in N.Y. Labor Law 201-d, arrest or conviction record, credit history, military status, uniformed service, unemployment status, salary history, or any other protected class of individuals as defined by City, State or Federal laws, rules or regulations.  Tenant shall comply with all statutory and regulatory obligations to provide reasonable accommodations to individuals with disabilities, due to pregnancy, childbirth or a related medical condition due to status as a victim of domestic violence, stalking, or sex offenses, or due to religion.

62

C.      Throughout the Term of this Lease, Tenant shall not discriminate against any employee or applicant for employment because of race, color, creed, national origin, age, sex, handicap, marital status or sexual orientation.  Tenant shall take affirmative action to ensure that employees and applicants for employment with Tenant, its sub-lessees, contractors and subcontractors are treated without regard to their race, color, creed, national origin, age or sex, handicap, marital status or sexual orientation, consistent with the provisions of the City's Human Rights Law, Adm. Code Sections 8-101 et seq., and shall take affirmative action to assist in providing training and job opportunities in order to ensure equal employment opportunities for members of minority groups with Tenant, its sub-lessees, contractors and subcontractors.  As used herein, the term "treated" shall mean and include, without limitation, the following: recruited, whether by advertising or other means; compensated, whether in the form of rates of pay or other forms of compensation; selected for training, including apprenticeship; promoted; upgraded; downgraded; demoted; transferred; laid off; and terminated.  Tenant will post in conspicuous places within the Premises, available to employees of Tenant and applicants for employment, notices provided by Landlord setting forth the language of this nondiscrimination provision.

D.      In addition:

(1)      Tenant, in all solicitations or advertisements for employees placed by or on behalf of Tenant, shall state that all qualified applicants will be considered for employment without regard to race, color, creed or national origin, age, gender, disability, marital status or sexual orientation;

(2)      Tenant shall send each labor union or other representative of workers with which it has a collective bargaining agreement or other contract or understanding relating to

employment at the Premises a notice advising such labor union or worker's representative of Tenant's agreement as contained in this paragraph and a copy thereof shall be sent to the Commissioner within three (3) days after notification to such union or representative; and

(3)     Tenant shall furnish to Landlord all information required by Landlord pursuant to this paragraph and will permit access by Landlord to its books, records and accounts for the purposes of investigation to ascertain compliance with this paragraph.  To evidence compliance with this Article, Tenant shall furnish such compliance reports as may from time to time be required by Landlord, such reports to contain information as to Landlord's practices, policies, programs, employment policies and employment statistics.  Such compliance reports shall, if Landlord so requests, contain the following information:

(i)     Information as to the practices, policies, programs, employment policies and employment statistics of Tenant, its sublessees, contractors and subcontractors on or related to the Premises;  and

(ii)     If Tenant has a collective bargaining agreement or other contract or understanding with a labor union or an agency referring workers or providing or supervising apprenticeship or training for such workers, or with a sublessee, contractor or subcontractor, such information as to such parties' practices and policies affecting compliance as Landlord may require,  provided that if information is within the exclusive possession of such party and such party shall refuse to furnish such information to Tenant, Tenant shall so certify to Landlord as part of its compliance report and  shall set forth what efforts it has made to obtain such information.

E.     Tenant shall include or cause to be included the provisions of this Article in every sublease, contract and subcontract of Tenant relating to the Premises and each obligation of each

64

such sublessee, contractor or subcontractor.

## ARTICLE 35

## INVESTIGATIONS

35.1    The parties to this agreement agree to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York ("**State**") or City governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit or inquiry.

35.2 (a)    If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York; or

35.2 (b)    If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel

the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City; then

35.3 (a)      The commissioner or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) days' written notice to the parties involved, to determine if any penalties should attach for the failure of a person to testify.

35.3 (b)      If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to Paragraph 35.5 below without the City incurring any penalty or damages for delay or otherwise.

35.4   The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

(a)      The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and/or

(b)      The cancellation or termination of any and all such existing City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the

66

hearing, without the City incurring any penalty or damages on account of such cancellation or termination; monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

35.5    The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in paragraphs (a) and (b) below. He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (c) and (d) below in addition to any other information which may be relevant and appropriate:

(a)    The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(b)    The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

(c)    The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(d)    The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under 35.4 above, provided that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in 35.3 (a) above gives notice and proves

67

that such interest was previously acquired.  Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

35.6 (a)       The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(b)       The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(c)       The term "entity" as used herein shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City or otherwise transacts business with the City.

(d)       The term "member" as used herein shall be defined as any person associated with another person or entity as a partner, director, officer, principal or employee.

35.7     In addition to and notwithstanding any other provision of this Lease the Commissioner or agency head may in his or her sole discretion terminate this Lease upon not less than three (3) days' written notice in the event Tenant fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Lease by the Tenant, or affecting the performance of this Lease.

**ARTICLE 36**

68

## FORCE MAJEURE

Any delay or failure in performance of the required improvements of the Premises by Tenant shall be excused if and to the extent caused by the occurrence of a Force Majeure.  For the purposes of this Lease, "Force Majeure" shall mean a supervening condition entirely beyond the control of Tenant, such as acts of God or the public enemy, hurricanes, war or other national emergency or shutdowns by City or State executive orders or legislation making performance temporarily impossible or illegal,  strikes or labor disputes not brought about by any act or omission of the Tenant, riot, or mob violence, or other events and occurrences in the same kind or class as those set forth directly above.  Under no circumstances will a delay be excused because of a general downturn in the economy, increased cost of building supplies, labor or utilities, or changing trends in the industry or changes in the neighborhood where the premises is located.  Force Majeure excuse does not apply to or in any way to excuse the Rent payment obligation in the Lease or the payment of Additional Rent due to the Tenant.  In the event of a pandemic or epidemic that is not accompanied by an executive order or legislation halting or making construction temporarily impossible or illegal, Plaintiff may request additional time from Landlord to complete the construction not to exceed three (3) months, and the decision to grant such an extension shall be in the sole discretion of Landlord. Any such extension, however, will not extend the Rent Concession Date.

## ARTICLE 37

## ENTIRE AGREEMENT

This Lease sets forth all of the promises, agreements, conditions and understandings between Landlord and Tenant relative to the Premises, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, expressed or implied, between them other than as herein set forth. Any agreement hereafter made shall be ineffective to change, waive, modify, discharge, terminate or effect an abandonment of this Lease in whole or in part unless such agreement is in writing and signed by the party against whom such change, waiver, modification, discharge, termination or abandonment is sought to be enforced.

## ARTICLE 38

## NO SURRENDER WITHOUT WRITTEN AGREEMENT

No act done by Tenant, its officers or agents during the Term of this Lease, shall be deemed a surrender of the Premises, and no agreement of surrender shall be valid unless the same shall be in writing and executed by Landlord and Tenant.

## ARTICLE 39

## MISCELLANEOUS

A.    Invalidity of a Provision.  If any term, covenant, condition or provision of this Lease shall be finally determined to be invalid or unenforceable by a court having jurisdiction,

70

such determination shall not affect the validity and enforceability of the remaining terms,
covenants, conditions and provisions of this Lease.

      B.    <u>No Payments to City Employees</u>. Tenant warrants and represents that no officer,
agent, employee or representative of The City of New York has received any payment or other
consideration for the making of this Lease and that no officer, agent, employee or representative
of The City of New York has any interest, directly or indirectly, in Tenant, this Lease or the
proceeds thereof. Tenant acknowledges that Landlord is relying on the warranty and
representation contained in this paragraph and that Landlord would not enter into this Lease
absent the same. It is specifically agreed that, in the event that the facts hereby warranted
represented prove, in the opinion of Landlord, to be incorrect, Landlord shall have the right to
terminate this Lease upon three (3) days' notice to Tenant and to rescind this transaction in all
respects.

      C.    <u>Governing Law</u>. This agreement shall be governed by and construed in
accordance with the laws of the State of New York without giving effect to any principles of
conflicts of laws. Tenant irrevocably consents and submits to the jurisdiction of any Federal,
state, county or municipal court sitting in the state of New York in respect to any action or
proceeding brought therein by Landlord against Tenant concerning any matters arising out of or
in any way relating to this Lease and irrevocably waives all objections as to venue and any and
all rights it may have to seek a change of venue with respect to any such action or proceedings.

      D.    <u>Terms Binding on Successors</u>. The terms and conditions herein shall bind and
inure to the benefit of Landlord and Tenant and their representatives, heirs, successors and
assignees.

      E.    <u>Headings, Captions and Table of Contents</u>. The descriptive headings and captions

71

used in this Lease are for the purposes of convenience only and do not constitute a part of this

Lease.  The Table of Contents hereof is for the purpose of convenience of reference only, and is

not to be deemed or construed in any way as part of this Lease.

F.    Counterparts.  This Lease may be executed in several counterparts and/or by

electronic signature (including .PDF), each of which shall be deemed an original and, all such

counterparts shall constitute but one and the same instrument and electronic delivery of such

counterpart shall be deemed proper delivery of such executed counterpart.

G.    Rules of Construction.  This Lease shall be construed without regard to any

presumption or other rule requiring construction against the party causing this Lease to be

drafted, each party having been represented by competent counsel.

## ARTICLE 40

## LANDLORD'S CONSENT

Whenever Landlord's consent is required under this Lease, such consent shall be in

writing and shall be subject to such conditions as Landlord may, in its sole and absolute

discretion, require, unless otherwise stated in this Lease.

## ARTICLE 41

### TENANT REPRESENTATIONS

A.      Tenant warrants and represents that, other than this assignment of the Original

Lease, it has not assumed any liabilities of Former Tenant, including, but not limited to, Former

Tenant's security deposit for the Property, judgments, unpaid wages, etc.

B.      The undersigned signatory for Tenant, by signing this Lease, personally warrants

that s/he has the power and authority to enter into this Lease on behalf of Tenant and to bind

Tenant to the terms of this Lease.

## ARTICLE 42

### TENANT'S SIGNAGE

A.      All signage, both interior and exterior, shall be fabricated and installed by Tenant

at Tenant's sole cost and expense, shall be subject to the prior written approval of Landlord

(based on a detailed colored rendering) as to location, design, size, materials, colors and method

of lighting (if illuminated), and shall conform to all applicable legal requirements.  Any changes

made by Tenant to its initial signage, both interior and exterior, shall also be subject to the

foregoing requirements.  In addition, any and all exterior signage, and any changes thereto, must

be submitted to and approved by the New York City Public Design Commission or its successor.

B.      Tenant shall be responsible for the costs of repairing any damage to the Premises

or the Building caused by Tenant's fabrication or installation of any of its signage.

C.      If any signage installed by Tenant is illuminated, such signage shall be connected

to Tenant's electric meter.

D.       In the event Landlord deems it necessary to remove any of Tenant's signage

73

(e.g., in order to perform repairs or alterations), then Landlord shall have the right to do so, provided that such signage shall be reinstalled by Landlord as soon as practicable.

E.    All signage, both interior and exterior, must be in good taste and prepared professionally (not hand-lettered) so as not to detract from the appearance of the Premises or the Building. No symbol, design, name, mark or insignia adopted by Landlord for the Building shall be used without the prior written approval of Landlord. Any sign or display visible from outside the Premises or the Building which does not meet with the foregoing criteria may be removed at any time by Landlord without Landlord incurring any liability therefor and without such removal constituting a breach of this Lease.

F.    Tenant, at its sole cost and expense, shall obtain all necessary sign permits and approvals in accordance with applicable legal requirements prior to any construction, installation, replacement or removal of Tenant's signs.

G.    At all times during the Lease Term and at Tenant's sole cost and expense, Tenant shall maintain its exterior signs and all interior signs which are visible from outside the Premises in good order and condition (including repair or replacement of broken lights), and shall repair and replace the same within five (5) business days after damage or failure.

H.    At Landlord's option, on the Expiration Date or earlier termination of the Lease, Tenant shall, at its sole cost and expense, remove all of its signs and repair any damage to the Premises or the Building resulting from such removal. Tenant's obligations under this section shall survive the Expiration Date or earlier termination of the Lease.

I.    Bill Lam represents that he is a principal of Broadway East Group, LLC, and is authorized by Broadway East Group, LLC to enter into this Lease.

74

## ARTICLE 43

### LANDLORD'S SIGNAGE

Landlord may, in its sole and absolute discretion, erect and maintain signs (including billboards) on the Premises or allow others to do so, whether by lease, license, permit or otherwise, but Tenant shall not be entitled to any part of the payments made to Landlord on account thereof nor shall Tenant be entitled to any setoff or reduction in Base Rent.

## ARTICLE 44

### BROKERAGE

Each party represents that no broker or agent was instrumental in bringing about or consummating this Lease and that Tenant and Landlord had no conversations or negotiations with any broker or agent concerning this Lease. To the fullest extent permitted by law, Tenant and Landlord hereby agree to indemnify, defend (in the event Landlord is providing a defense to Tenant, such defense may in Landlord's sole discretion be provided by the New York City Law Department) and hold each other harmless against any and all loss, damage, liability, cost and expense of any nature based on any claim by any party with whom such indemnifying party has dealt for a commission or other compensation in connection with this Lease which is based on the actions of such party or its agents or representatives. Each party agrees to pay the other party's reasonable attorneys' fees only for the activity of determining whether a claim is subject to this indemnification obligation and, if the party with the indemnification obligation disclaims, for the successful enforcement of this indemnity provision. The indemnified party shall reasonably cooperate with the indemnifying party in any defense; the indemnified party shall not settle a claim, liability or action for which the indemnifying party has the obligation to defend or indemnify without the

75

indemnifying party's reasonable consent. The forgoing indemnifications shall survive any expiration or termination of this Lease.

## ARTICLE 47

## SURVIVAL

Any obligation of Tenant which by its nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after the expiration or earlier termination of this Lease, and any liability for a payment which shall have accrued to or with respect to any period ending at the time of such expiration or termination, unless expressly otherwise provided in this Lease, shall survive the expiration or earlier termination of this Lease. No delay by Landlord in rendering any bill or statement shall be deemed a waiver or release of Tenant's obligation to make the payment reflected on that bill or statement.

**[Signature Page is Next Page]**

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Lease as of the

day and year first above written.

**LANDLORD:**
**THE CITY OF NEW YORK**


By: _____
     Laura Ringelheim
     Executive Deputy Commissioner
     Department of Citywide Administrative Services


**TENANT:**
**BROADWAY EAST GROUR, LLC,**


By: _____

Title: _____


Approved as to Form:


_____
  Acting Corporation Counsel

## UNIFORM FORM OF ACKNOWLEDGEMENT

STATE OF                              )
                                     )  SS.:
COUNTY OF                            )


      On this     day of                , 20   , before me, the undersigned, a notary public, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity and that by her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.


_____

Notary Public ←*Strike-out*→ Commissioner of Deeds


STATE OF  NEW YORK    )
                     )  SS.:
COUNTY OF  NEW YORK  )


      On the     day of                , in the year 20   , before me, the undersigned, a notary public, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____

Notary Public ←*Strike-out*→ Commissioner of Deeds

# EXHIBIT "X"

## LIST OF EXISTING SUBTENANTS

(annexed hereto)

## EXHIBIT "Y"

## SCOPE OF WORK